**In the Matter of S.H.**

Nos. S–8386, S–8395.

Supreme Court of Alaska.

Aug. 20, 1999.

Rehearing Denied Sept. 20, 1999.

Phillip Paul Weidner, Weidner & Associates, Inc., Anchorage, for S.H.

Craig F. Stowers and Thomas V. Van Flein, Clapp, Peterson & Stowers, Anchorage, for Clapp, Peterson & Stowers.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

S.H. sued his former employer and others. His attorneys in that action were Clapp, Peterson & Stowers (CPS). Asserting that they believed S.H. to be incapable of making rational decisions about settlement of that lawsuit, S.H.'s attorneys later petitioned the superior court to appoint a conservator for S.H. The court appointed a conservator, who settled S.H.'s claims against his former employer. S.H. appeals from the decision to appoint a conservator. We conclude that it was not error to appoint a conservator under the circumstances of this case. In affirming, we reject S.H.'s claims that the appointment was inappropriate, infringed upon his jury trial rights, or was unsupported by necessary factual findings, and that CPS violated duties it owed S.H. But in CPS's cross-appeal, we vacate the award of the conservatorship costs against CPS and remand, because we conclude that S.H. should have borne those costs.

### II. FACTS AND PROCEEDINGS

Anchorage Refuse, Inc. (ARI) employed S.H. from 1991 to 1993. In April 1995 S.H. sued ARI and individual ARI officers and employees alleging that his fellow employees sadistically and physically mistreated him. CPS represented S.H. on a contingent fee basis in that lawsuit.

From May 1995 to December 1996 CPS pursued the case, remaining in close and frequent contact with S.H. CPS attorneys Marcus Clapp and Thomas Van Flein grew increasingly uneasy, however, about S.H.'s growing obsession with the case. There was evidence S.H. displayed various indicia of instability, including irrational behavior,[1] paranoia,[2] inclinations toward gratuitous dismissal of his personal injury suit,[3] a tendency to threaten his own witnesses,[4] the desire to initiate direct and inappropriate dealings with opposition counsel and the judge,[5] and a marked lack of confidentiality.[6] In May 1996 Clapp wrote a letter to S.H. regarding S.H.'s behavior in the case. Van Flein arranged for S.H. to visit Dr. Marjorie Smith, a psychiatrist, for counseling in preparation for trial.

Psychiatric experts examined S.H. in 1996 and 1997, in connection with both the ARI litigation and the conservatorship proceeding. The perception among the majority of these experts, Drs. Aaron Wolf, Marjorie Smith,[7] and Bruce Smith,[8] and the court

---

1. Mediator Daniel A. Moore, Jr. presided over the mediation between S.H. and ARI. He described S.H. as becoming "irrational." S.H. also apparently said at an Alaska Public Utilities Commission meeting that he was a federal "confidential informer" and that Clapp and Van Flein were under investigation.

2. S.H. accused his lawyers, the trial judge, and mediator Moore of being bribed by the opposition to work against him. One doctor also reported S.H.'s statement that

> the Anchorage Police Department has attempted a cover-up, as has the Executive Director of the Alaska Public Utilities Commission, the State Troopers Criminal Investigation Unit, the Attorney General's Office, and the U.S. Department of Labor, Wage, and Hour, and the FBI.... [S.H.'s] perception is that there was a large scale cover-up that included all the above-mentioned, as well as the Anchorage news media.

3. CPS attorneys testified that S.H. "would just want to give up on his lawsuit and [he'd] insist that we dismiss it for him for nothing." According to one of S.H.'s doctors, this desire to dismiss for nothing continued even after the $500,000 settlement offer. S.H. vacillated between gratu-

itous dismissal and continued prosecution of his claims throughout this period.

4. According to CPS, S.H. threatened one of his own witnesses, Bob Lohr, at Mr. Lohr's office, and was "kicked out of" that office.

5. S.H. appeared at ARI's counsel's offices unaccompanied by CPS and against CPS's recommendation, and was nearly arrested. S.H. also initiated direct contact with the opposition's private investigator, with whom he discussed his legal strategy. He also threatened to go to the assigned superior court judge's chambers to demand a settlement.

6. CPS contended that S.H. faxed confidential documents to a reporter, and, against counsel's advice, revealed confidential information casually to fellow union members.

7. Dr. Marjorie Smith diagnosed S.H. as having "a paranoid personality disorder and a post traumatic stress disorder." She said he did not have an ability to make competent and reasonable judgments regarding the ARI litigation.

8. Dr. Bruce Smith found that

> [S.H.] appears at present [in September 1996] to be functionally impaired, relative to

visitor, Betty Wells,[9] was that a mental impairment made S.H. unable to think rationally at times. Only Dr. Frank Gonzales, a clinical psychologist, found S.H. capable of dealing rationally with the settlement proceedings.[10]

In December 1996 mediation began between S.H. and ARI. ARI offered to settle for $500,000. S.H. personally stated he thought he could get $2 million. According to the mediator, S.H. then made "accusations against lawyers and judges without any foundation for them." S.H. refused to accept ARI's offer.

Believing S.H. to be incapable of handling his own affairs, CPS commenced a new proceeding by filing a "Petition for Appointment of Limited Conservator/Guardian Ad Litem of a Person." On December 30 Superior Court Judge Karen L. Hunt appointed Ernest Schlereth to act as S.H.'s attorney in the conservatorship/ guardianship proceeding.

In January 1997, when it appeared a settlement with ARI might be reached, Schlereth and CPS agreed to dismiss the petition; when S.H. refused to agree to the settlement, CPS and Schlereth agreed to reinstate the petition.

In March Phillip Paul Weidner replaced Schlereth as S.H.'s counsel in the conservatorship/guardianship proceeding. When Master Andrew Brown commenced the hearing on the petition on July 10, 1997, Weidner

requested a jury trial on the petition; the master denied the request.

The hearing lasted three days. The master issued his report in August.[11] He recommended that the superior court appoint a special conservator to act on S.H.'s behalf for purposes of the ARI litigation, and that the costs of conservatorship be imposed on CPS. The superior court adopted the master's report,[12] and appointed Paul Cossman as the Special Conservator. After reviewing the case, Cossman concluded: "I have no doubt that it is in the best interests of [S.H.] to accept the settlement offer of $500,000." Cossman expressed his opinion that "[S.H.'s] chances of recovering a judgment in excess of the settlement offer were basically nonexistent."

Cossman, CPS, and ARI then stipulated to interplead the settlement funds. The $500,000 settlement proceeds were deposited with the court registry and await distribution pending resolution of this dispute.

S.H. appeals the decision to appoint a special conservator. CPS cross-appeals the imposition of the conservatorship costs on CPS.

## III. *DISCUSSION*

### A. *Standard of Review*

■ We review a special master's findings under the clearly erroneous standard of review.[13]

---

his ability to work. His singular focus is on the outcome of the current case, and he maintains a hypervigilance, due to his expectation that there will be retaliation. He is capable of self-absorbed thinking and tangential thinking, in which others' reality is not necessarily incorporated into his thinking process.

9. Ms. Wells stated that

[S.H.], while not in need of the services of a full conservator for assistance in managing his day to day finances, continues to require a special protective order with respect to the lawsuit, its outcome and any settlements.

10. Dr. Gonzales testified that he had "no problem" as to S.H.'s ability to take part in the ARI proceedings. But he also stated that S.H. was depressed and paranoid.

11. Neither the master's report nor the superior court order was included in the excerpt. *See* Alaska R.App. P. 210(c)(2) ("The appellant's ex-

cerpt of record shall contain a true and correct copy of ... the judgment or interlocutory order from which the appeal is taken [and] ... supporting opinions, findings of fact, conclusions of law or other statements showing the reasoning of the trial court"). The cross-appellant's excerpt is equally deficient for failing to remedy these omissions and for failing to include the order imposing costs on CPS. *See* Alaska R.App. P. 210(c)(2) ("The appellee's excerpt of record shall contain a copy of those parts of the record relied on by the appellee which were *not* included in the appellant's excerpt.").

12. *See* Alaska R. Civ. P. 52(a) ("The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court.").

13. *See Bowman v. Blair*, 889 P.2d 1069, 1072 n. 5 (Alaska 1995); *Matson v. Matson*, 639 P.2d 298, 299 n. 1 (Alaska 1982); Alaska R. Civ. P. 53(d)(2).

Issues of constitutional interpretation are questions of law which we review de novo,[14] applying our independent judgment.[15] In dealing with questions of law, we will adopt those rules which are most persuasive in light of precedent, reason, and policy.[16]

### B. Was It Appropriate to Appoint a Conservator for S.H.?

S.H. first argues that the master erroneously treated the petition filed by CPS—titled a "Petition for Appointment of Limited Conservator/Guardian Ad Litem of a Person"—as a petition for conservatorship. Although CPS's petition originally referred to the statutes governing guardianships, not the statutes governing conservatorships, it appears that S.H. had notice that the proceeding would be conducted under the conservatorship statutes. When the parties briefly dismissed and then reinstated the proceeding, they both treated it as a petition for conservatorship. The court treated the proceeding from the beginning as one for appointment of either a conservator or a guardian. The court's appointment of a visitor under the guardianship statute presumably covered all possible future options. It also appears that S.H. did not raise this objection until after the master made his recommendation on August 7, 1997, and that S.H.'s original attorney acceded to the procedure the master and the superior court followed. We conclude that S.H. did not preserve the issue. Finally, it is not apparent that S.H. was materially prejudiced by this alleged error. The superior court appointed counsel for S.H., appointed a court visitor, and concluded that CPS had demonstrated incapacity by "clear and convincing evidence."

We next reject S.H.'s assertion that a conservatorship did not appropriately deal with S.H.'s circumstances. S.H. argues that settling a legal claim is outside the scope of conservatorship powers, because it extends beyond the purely financial and touches on questions of justice and emotional satisfaction. We conclude, however, that AS 13.26.280(c)(19) gives a conservator authority to settle a lawsuit. That statute grants a conservator the power to act, without court authorization or confirmation, "to settle a claim by or against the estate or the protected person by compromise, arbitration or otherwise." [17]

S.H. next argues that the superior court made insufficient factual findings and applied the wrong standard for appointment of a conservator. Alaska Statute 13.26.165 permits appointment of a conservator only when the court determines:

> (A) the person is unable to manage the person's property and affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance; and

> (B) the person has property which will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care and welfare of the person or those entitled to be supported by the person and that protection is necessary or desirable to obtain or provide funds.[18]

The superior court made no finding satisfying subsection (2)(B). The master's report addresses only subsection (2)(A). But any error in failing to make the necessary findings was harmless, given the evidence in this case that made it essentially undisputed that S.H. had property (the lawsuit) which would be wasted or dissipated unless proper management were provided. The evidence included S.H.'s threats to deal independently with opposing counsel, his talk of dismissing the case, and the opinions of the CPS attorneys that S.H. had "deteriorated in the depo-

---

14. See Agen v. State, Dep't of Revenue, Child Support Enforcement Div., 945 P.2d 1215, 1219 n. 6 (Alaska 1997).

15. See Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

16. See Langdon v. Champion, 752 P.2d 999, 1001 (Alaska 1988); Guin, 591 P.2d at 1284 n. 6.

17. AS 13.26.280(c)(19).

18. AS 13.26.165(2) (emphasis added).

sition" and that the $500,000 offer was a "windfall."

S.H. further argues that the court erred in considering his ability to make litigation-related decisions, as opposed to his ability "to make a rational decision in general."

We disagree with S.H.'s interpretation of the standard for appointing a conservator in Alaska. Alaska Statute 13.26.165 does not require that a person be altogether incompetent in all aspects of life. And AS 13.26.205(c) states: "If only certain powers need be given to the conservator or the services of a conservator are needed only for a limited number of transactions, a special conservator may be appointed." A special conservatorship cannot be reconciled with a requirement that a conservatorship candidate be found wholly incapable of making any rational decision. And it is counter-intuitive to think that an ability to function at some level, perhaps around the house, or while shopping or driving, would require denial of a conservatorship for more complex matters. We think the need for a conservator must be assessed in context of the person's incapacity and the specific matters for which management or protection may be required. The superior court here applied the appropriate standard called for by the issue at hand.

The final appointment question is whether there was sufficient factual basis under AS 13.26.165 to find S.H. unable to manage his property effectively. That statute required the court to find that S.H. was "unable to manage [his] property and affairs effectively" due to mental illness, mental deficiency, or some other factor.[19] The master's report, adopted by the superior court, found that S.H. was "unable to reasonably and meaningfully work with [CPS] on his very important property interest in the ARI Case, and decide on whether the settlement offer from ARI should be accepted or the

matter should go to trial." The master specifically cited the following findings:

(1) the extensive contact by [S.H.'s] ARI Case attorneys with him; (2) their attempts to apprise him of the problems he was causing; (3) their having [S.H.] go to Dr. Marjorie Smith for psychiatric assistance in order to be more able to deal with the ARI Case; (4) Dr. Smith's professional opinion after five months of regular involvement with [S.H.] as to his having a mental illness and his inability to work with his counsel and make a decision; (5) Justice Moore's [20] opinion as to [S.H.] becoming "irrational" in the mediation process; and (6) [S.H.'s] post-mediation contact with opposing counsel against his attorney's longstanding warnings.

S.H. argues that "none of these findings of fact supports a conclusion that [he] is unable to effectively manage his property and affairs on a long term basis, which is clearly the requirement for appointment of a conservator contemplated by AS 13.26.165."

Because we have never before addressed AS 13.26.165, no Alaska cases support S.H.'s view that the statute requires a "long term" inability to manage one's property. We must look to the statute to determine its requirements. It does not express or imply a requirement of long term inability; it only specifies that property be in danger of waste or dissipation.[21] Under this standard, inability to manage one's property and affairs need not be long-term to justify a conservatorship. Even brief incapacity could permit loss of property in a given case; invariably requiring long-term incapacity would be at odds with the protection the statute appears intended to provide.

S.H.'s doctors provided considerable evidence of his inability. Dr. Marjorie Smith opined that she did not believe S.H. could work with any attorney on the ARI case and come to a reasonable decision. Dr. Bruce Smith opined that S.H. was "functionally impaired" and disconnected from "others' reali-

---

19. AS 13.26.165(2)(A).

20. Mediator Moore is a former justice of this court.

21. *See* AS 13.26.165(2)(B).

ty." Dr. Aaron Wolf stated that he agreed with Dr. Marjorie Smith's diagnosis of S.H. "right down the line." And Betty Wells, the court visitor, recommended that a guardian be appointed to make litigation decisions for S.H.

The superior court did not commit clear error in accepting the evidence as clear and convincing proof of S.H.'s inability to manage his property and affairs effectively.

■ S.H. insists that AS 13.26.165 requires a finding of mental illness. We conclude that, even assuming mental illness does not describe S.H.'s condition, the incapacity documented here satisfied the statute.[22]

### C. Did CPS Violate Professional Responsibilities or Duties It Owed S.H.?

■ S.H. claims that CPS "ignored its fiduciary duty" to him, and its duty to use reasonable care[23] and to exercise "the utmost good faith, integrity, fairness, and fidelity."[24] He implies that CPS decided to settle not because it held S.H.'s interests to heart but because his case "required a lot of time, and after a certain period it was apparent that it would not bring in a large fee" for CPS.

■ Alaska Rule of Professional Conduct 1.14(b) permits a lawyer to "seek the appointment of a guardian or take other protective action with respect to a client only when the lawyer reasonably believes that the client cannot adequately act in the client's own interest." If the requirements of Rule 1.14 are met, a lawyer may seek a guardian to protect the client's interests despite the client's disapproval. Because we have concluded that the superior court did not err in appointing a conservator, we necessarily conclude that CPS acted reasonably in filing its petition. We accordingly reject S.H.'s argument that CPS acted disloyally or breached any duty by filing the petition.

### D. Did Appointment of a Conservator Violate S.H.'s Jury Trial Rights?

■ S.H. argues that appointing a conservator to deal with S.H.'s claims against his former employer deprived him of jury trial rights guaranteed him by the federal and Alaska constitutions.

■ Although some courts have said that a guardian cannot waive a ward's rights, they have done so largely in context of waivers of substantive rights.[25] Other courts have expressly or impliedly affirmed the power of a guardian or conservator to waive procedural rights in order to achieve a benefit for the ward.[26] We think that a conservator must have this authority.

■ Policy militates in favor of giving the conservator this power. If the conservator were unable to waive the ward's jury trial rights, no case triable by a jury could ever be settled. The ward—already deemed incapable in the law's eyes—would effectively retain control of the case. The purpose of the conservatorship, to protect the ward,[27] would

22. See AS 13.26.165(2)(A).

23. See Alaska Rules of Professional Conduct 1.1–1.8.; cf. Van Horn Lodge, Inc. v. White, 627 P.2d 641, 643 (Alaska 1981), overruled on other grounds by Lee Houston & Assocs. v. Racine, 806 P.2d 848, 855 (Alaska 1991).

24. Palfy v. Rice, 473 P.2d 606, 608 (Alaska 1970).

25. See, e.g., Cloud v. Market St. Ry. Co., 74 Cal. App.2d 92, 168 P.2d 191, 198 (1976) (affirming guardian's waiver of jury trial); In re Guardianship of Mabry, 281 Ill.App.3d 76, 216 Ill.Dec. 848, 666 N.E.2d 16, 22 (1996) (holding guardian impermissibly waived objection to unreasonable damages assessment) ("A conservator or guardian cannot waive any rights of the ward."); Jeanblanc v. Mellott, 152 Ill.App.3d 801, 105 Ill.Dec. 705, 504 N.E.2d 990, 997 (1987) (holding guard-ian impermissibly waived defense of usury in debt litigation) ("[T]he rule that a conservator or guardian cannot waive any rights of the ward is so well settled that it may be said to be fundamental and elementary.").

26. See In re Christina B., 19 Cal.App.4th 1441, 23 Cal.Rptr.2d 918, 926 (1993) ("[T]he guardian may not compromise fundamental rights, including the right to trial, without some countervailing and significant benefit."); In re Simons, 215 Mont. 463, 698 P.2d 850, 851 (1985) (guardian impermissibly waived right to counsel) ("attorney and guardian acting in concert, may waive the [ward]'s rights").

27. See AS 13.26.165, .245.

be thwarted.[28] We therefore affirm, holding that a conservator has the power to waive the ward's jury trial rights. We note that the conservator must still exercise the statutory standard of care, which is equivalent to that of a trustee.[29]

▉ S.H. also argues that the master improperly denied his request for a jury trial on the question of his need for a conservator. He cites AS 13.26.113 in support.[30] CPS responds that S.H. did not timely request a jury trial.

Alaska Probate Rule 11 requires that a demand for jury trial in this type of proceeding must be served "no later than 20 days after service of the first pleading directed to a triable issue or five days before the scheduled hearing, whichever is earlier."[31] The first pleading here was filed in December 1996. S.H. first requested a jury when the hearing began, on July 10, 1997. The request was untimely.

S.H. asserts briefly that his constitutional jury trial rights were infringed in the hearing on his need for a conservator. Not only is this assertion insufficiently briefed,[32] it does not protect S.H. from the consequences of his own waiver.[33] We affirm the superior court's determination that S.H. waived his right to jury trial of the conservatorship question.

### E. Was It Error to Impose the Costs of Conservatorship on CPS?

▉ The superior court imposed the costs of the conservatorship on CPS. CPS, arguing that it was error to do so, cites a comment to Alaska Professional Conduct Rule 1.14 that implicitly envisions the client bearing the cost of conservatorship.[34] S.H. argues that the judge had authority to impose the costs on CPS.

Alaska Statute 13.26.230 states: "If not otherwise compensated for services rendered, any ... conservator or special conservator ... appointed in a protective proceeding is entitled to reasonable compensation from the estate." Neither S.H. nor the court nor the master has cited any statutory authority for imposing this cost on the petitioner, and we are aware of none. Such a practice also seems contrary to the implication inherent in the comment to Rule 1.14. Where the purpose of the conservatorship is to protect the client's property, it is not obvious why the petitioner, even if it is the client's law firm, should bear the cost of the conservatorship. It is logical that normally the cost be charged against the estate thus preserved.

Concluding that it was error to impose the conservatorship costs on CPS, we remand to the superior court with directions to impose those costs in accordance with AS 13.26.230.

28. S.H. also argues that the court cannot take away his right to jury trial by simply following some "benevolent social theory." He cites R.L.R. v. State, 487 P.2d 27 (Alaska 1971), in which we upheld a minor's right to demand a jury trial. See id. at 31. That case does not support S.H. We there stated that the decision to go to jury trial should be made by a guardian ad litem acting in the child's best interest. See id. at 34.

29. See AS 13.26.245, which imposes the requirements of AS 13.36.075 ("the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent man dealing with the property of another ....").

30. AS 13.26.113(a)(6) states that a respondent in an incapacity hearing under AS 13.26.106 has the right to have that issue tried by jury.

31. S.H. argues that AS 13.26.113 trumps Probate Rule 11. S.H.'s argument is incorrect; rules are not invalid when they regulate the procedure used to exercise statutory rights. See Gieffels v. State, 552 P.2d 661, 667–68 (Alaska 1976) (upholding a rule because the rule regulated "only the procedural aspects" of the statutory right and did not infringe on the substantive statutory right).

32. "[W]here a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal." Adamson v. University of Alaska, 819 P.2d 886, 889 n. 3 (Alaska 1991).

33. See, e.g., Kletzelman v. Capistrano Unified Sch. Dist., 91 F.3d 68, 71 (9th Cir.1996) (litigant was not protected by constitution when she filed after ten-day federal limit had expired).

34. The comment to Rule 1.14 includes the following sentence: "In many circumstances, however, appointment of a legal representative may be expensive or traumatic for the client."

## IV. CONCLUSION

We AFFIRM the order appointing the conservator. We VACATE the order imposing the conservatorship costs on CPS, and REMAND with directions that these costs be imposed on S.H.