**In the Matter of the Protective Proceedings of M.K.**

No. S–13787.

Supreme Court of Alaska.

June 15, 2012.

Joseph R. Faith, Dillingham, for M.K., Appellant.

Laura C. Bottger, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee State of Alaska, Department of Health & Social Services.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

STOWERS, Justice.

## I. INTRODUCTION

M.K. is a 34–year–old mentally ill Alaska Native woman who lives in a rural village.[1] In 1999, when M.K. was 22, her father A.K. sexually assaulted her. M.K. reported the crime to police, but soon changed her story and A.K. was not tried at that time. A.K. continued to live with the family for four years until advances in DNA evidence led to his case being reopened, and to A.K. being charged and convicted in 2003 of the sexual assault. M.K.'s mother remains married to A.K., who has since been released from prison and is on probation and prohibited from living with M.K. M.K.'s mother has no plans to divorce A.K., and testified that she is not sure whether A.K. will return to live with the family when his probation ends.

The Department of Health and Social Services (DHSS) petitioned for guardianship of M.K. in July 2008 based on M.K.'s mental illness and her inability to manage her own care. The court visitor completed a report, and a hearing was held over several days, following which the superior court appointed the Office of Public Advocacy (OPA) as M.K.'s full guardian. M.K. objected to this decision. The superior court treated her written objection as an implicit motion for reconsideration and denied it. M.K. now appeals, arguing that the superior court erred in its application of the guardianship statutes in her case, in its best interest finding that OPA should be appointed in place of

---

**1.** We use initials to protect M.K.'s privacy; for the same reason, we do not identify M.K.'s village.

M.K.'s mother, and in appointing OPA as a full (as opposed to partial) guardian. We affirm.

## II. FACTS AND PROCEEDINGS

### A. Factual Background

M.K. is a 34-year-old Alaska Native woman. When M.K. was approximately 16–18 years old, she was severely beaten by her boyfriend, and is thought to have sustained a brain injury from the assault. M.K. has also been diagnosed with schizophrenia, depressive disorder, and possible post-traumatic stress disorder.

M.K. lives in a small rural Alaska village in a house adjacent to her mother's. Although M.K. is capable of routine activities such as dressing, bathing, feeding herself, cooking, cleaning for the family, and caring for her daughter while her mother works,[2] her mental illness prevents her from being able to concentrate on the activities of daily living.

M.K. currently receives a Social Security payment of $700 per month. Although she should qualify for additional aid, M.K. has not obtained it, even with the assistance of the Alaska Legal Services Corporation; Don Cline, M.K.'s therapist; and Page O'Connell, a case manager. According to Cline, M.K. is unable to secure aid on her own because her thinking is too disorganized and slow to enable her to follow through.

M.K. does not want a guardian. However, Cline, Dr. Kathryn Hyndman (M.K.'s physician), the court visitor,[3] and M.K.'s mother agree that M.K. needs a guardian. M.K. proposed that her mother help her make choices if the court determined that she had to have assistance; M.K. testified she wanted to be "[her] own guardian" and would prefer to make her own choices.

Dr. Hyndman testified that M.K. was so preoccupied with her delusions—which include a belief that "the peoples of [her village] are ... 'puppets of the devil'" and that there is a muskrat living in her stomach—that she could not make decisions on other aspects of her life, and that M.K. "spends so much time dealing with her delusions that she is unable to concentrate on ... the activities of daily living." Dr. Hyndman testified that M.K. was not taking her anti-psychotic medication because she was breast-feeding her daughter. Dr. Hyndman also testified that M.K.'s schizophrenia was unlikely to improve without such medication.

Dr. Kerry J. Ozer assessed M.K. in May 2009 and recommended psychotropic medication, a structured living situation, and wrap-around services. Dr. Ozer stated that "[w]ithout a higher level of care [M.K.] is likely to continue to suffer from her paranoid delusions and further deterioration in functioning is to be expected."

M.K.'s mother received her personal care attendant certificate in 2002 in order to take care of M.K. M.K.'s mother's work includes helping clients complete applications for assistance such as Medicaid, food stamps, and lighting and heating assistance.

M.K.'s father A.K. sexually assaulted M.K. in 1999, when she was 22 years old. M.K. reported the crime, but M.K.'s mother did not believe M.K. and has not always been supportive. A.K. continued to live with M.K. and the family for years after the assault until—with advances in DNA evidence processing—A.K. was charged with and convicted of sexual assault.

Superior Court Judge Fred Torrisi presided at A.K.'s criminal trial, as well as at several Child in Need of Aid (CINA) cases involving M.K. and her family. The court found in one of the CINA cases that "[M.K.'s] testimony [in the criminal case] was vague and inconsistent; neither [M.K.] nor

---

**2.** M.K. has had five children, though all have been placed elsewhere. One of M.K.'s daughters was placed with M.K.'s mother by the village Traditional Council.

**3.** Alaska Statute 13.26.106(c) requires the court to appoint a "visitor" to evaluate the facts and circumstances underlying a guardianship petition and report to the court: "The visitor shall arrange for evaluations to be performed and prepare a written report to be filed with the court.... The visitor shall interview the respondent.... The visitor shall conduct the interviews and investigations necessary to prepare the report...." *Cf.* BLACK'S LAW DICTIONARY 1708 (9th ed. 2009) ("visitor ... A person appointed to visit, inspect, inquire into, and correct corporate irregularities.").

her mother seemed to want [M.K.'s father] to be convicted."[4]

In a 2009 assessment, M.K.'s therapist Don Cline wrote:

[M.K.] is very delusional and paranoid, afraid others are out to harm her at home.... Because of the level of abuse she has suffered in her life coupled with her paranoid thoughts/delusions this has made her access to health care difficult for she trusts no one and it is hard for her to reach out. Also, her family [is] tired of listening to her delusions and she really has no one but us to talk out her delusional thoughts.

Cline also wrote: "[M.K.'s] mother tends not to believe her when she says she has been abused and will dismiss the complaints."

M.K. wishes to remain in her village. The conditions of A.K.'s probation bar contact with M.K. until he is released from parole in 2012. During his probation, A.K. planned to live elsewhere, and M.K.'s mother testified that no decision had been made concerning where he would live after his probation ends. However, M.K.'s mother also testified that in her opinion M.K. will be safe from A.K. while she is around. Cline noted his concern that upon A.K.'s release from probation, A.K. would end up returning to M.K.'s village and living with M.K. and her mother once more.

Cline testified that M.K. is unable to feel safe due to trauma from past abuse, and that her fear of sexual abuse can be incapacitating to such an extent that she does not want to leave her house. Dr. Ozer explained that M.K.'s family does not "seem to understand the nature and severity of her mental illness," and Cline testified that although M.K.'s mother was aware that M.K. had delusions, she was not familiar with the specifics. M.K. has frequently called crisis lines for reassurance and help.

## B. Procedural Background

A social worker with DHSS filed a petition for guardianship of M.K. in July 2008, based on M.K.'s mental illness and inability to manage her own care. In June 2009 the court-appointed visitor for M.K. visited her village and interviewed M.K., along with her social worker, her mother, and Cline. The visitor found that M.K.'s mental condition "impairs her insight and judgment for decision making. It is not expected that her abilities will improve significantly without medication and wraparound services." The visitor noted that A.K. would likely return to M.K.'s village upon his release, and expressed concern for M.K.'s safety. The visitor explored alternatives to guardianship, but concluded that a full guardian was appropriate for M.K. "given her impairments," and requested that OPA be appointed as her guardian "because no one in [M.K.'s] family, including [her mother,] can objectively make decisions in [M.K.'s] best interest."

The superior court held a hearing over three days, on July 30, August 5, and August 11, 2009. Both parties were represented by counsel; the court visitor submitted her report and also testified; and Cline, Dr. Hyndman, M.K., and M.K.'s mother testified as well. Judge Torrisi gave the parties notice that he had heard "several other matters" involving M.K. over the years, and set forth various findings he intended to rely on from these other proceedings.

These findings included A.K.'s conviction for sexual assault, the fact that neither M.K. nor M.K.'s mother "seemed to want [A.K.] to be convicted," that A.K. remained in the house for years after his assault on M.K., and that M.K.'s mother "doesn't believe that any crime was committed." The court had also found that M.K. "is mentally ill and easily influenced, especially by her mother," and found based on observing M.K. at various trials over a ten-year period that M.K. "was indeed abused as a child, [and] that her mother failed to protect her."

Following the hearing, the superior court issued initial findings of fact and conclusions of law, but allowed the parties more time "to provide further input before disposition is completed." The court found that M.K. required a guardian because the "evidence [was] overwhelming that she [was] incapacitated within the meaning of the [guardianship] statute," and that OPA, not M.K.'s

---

4. In the guardianship proceeding, the superior court expressly relied on its previous findings.

mother, should be appointed as guardian. The superior court explicitly noted that it had considered M.K.'s preference in accordance with AS 13.26.113(g),[5] but found that OPA had the "expertise and independence" to act in M.K.'s best interest. The court also reserved to M.K. the decision to "determine in what community she lives" under AS 13.26.113(e).

M.K., acting through counsel, filed a statement of her "position with respect to the court's findings" on September 10, 2009. In this statement, M.K. objected to the court's finding that she was incapacitated and needed a guardian, and also objected to the appointment of OPA instead of her mother, who she argued has statutory priority under AS 13.26.145(d)(1) and (3).[6] M.K. further argued that "[u]nder AS 13.26.145(f), the court is required to make [an] appropriate written finding related to why the best interests of the respondent require appointment of a person with a lower priority." Finally, M.K. argued that the court can appoint OPA as guardian only if " 'no person' is willing and qualified to perform the functions," citing AS 13.26.370(b).[7] M.K. also complained that the court visitor's report was conclusory in asserting that "[a]lthough family does have a higher priority, a public guardian is more appropriate at this time because no one in [M.K.'s] family, including [M.K.'s mother],

can objectively make decisions in M.K.'s best interest"; M.K. argues that the court should not have relied on this "generalized conclusion."

The superior court treated M.K.'s filing as a motion for reconsideration and denied it on September 14, 2009. On January 15, 2010, the superior court issued its final findings of facts and conclusions of law, and its order of guardianship. It found that M.K. was incapacitated as defined in AS 13.26.005(5) [8], and appointed OPA as a full guardian, reserving to M.K. the right to choose the community in which she wanted to live. The court explained that it

> is in the best interest of the ward and is in compliance with AS 13.26.145(f) because [M.K.'s] family members are not appropriate for this appointment at this time. The Office of Public Advocacy has the expertise and independence to act [on M.K.'s] behalf, and may delegate powers where that is in her best interest.

M.K. appeals.

## III. STANDARD OF REVIEW

 "The initial selection of a guardian or conservator for an incapacitated person is committed to the sound discretion of the superior court," [9] and we will review the superior court's selection for abuse of discretion.[10] Best interest findings are subject to

**5.** Alaska Statute 13.26.113(g) provides: "If it is necessary to appoint a guardian, the court shall consider the ward's preference."

**6.** Alaska Statute 13.26.145(d) provides in part:

[Q]ualified persons have priority for appointment as guardian in the following order:
(1) an individual or organization nominated by the incapacitated person if, at the time of the nomination, the incapacitated person had, in the opinion of the court, sufficient mental capacity to make an informed choice;
. . .
(3) an adult child or parent of the incapacitated person;
. . .
(7) the public guardian.

**7.** Alaska Statute 13.26.370(b) provides: "A court may order the public guardian to act as full guardian, partial guardian, conservator, or special conservator for a person who is determined under this chapter to be in need of guardianship or conservatorship service if no person or private

guardianship association is willing and qualified to perform the function."

**8.** The superior court's findings stated that it found M.K. was incapacitated as defined in AS 13.26.005(4). However, AS 13.26.005(4) defines the term "guardian." Alaska Statute 13.26.005(5) provides: " '[I]ncapacitated person' means a person whose ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance." The court's erroneous reference to subsection (4) is harmless.

**9.** *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc. ex rel. H.L.S.*, 42 P.3d 1093, 1096 (Alaska 2002) (citing *In re Estate of Romberg*, 942 S.W.2d 417, 419 (Mo.App.1997); 39 AM.JUR.2D *Guardian and Ward* § 40 (1999)).

**10.** *Id.* (citing 39 AM JUR 2D *Guardian and Ward* § 40).

review for abuse of discretion.[11] In appointing a guardian, the superior court "abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors." [12]

■■■ We will review "factual findings involved in determining whether a guardian or conservator should be appointed for clear error." [13] "[A] finding is clearly erroneous when a review of the entire record leaves [us] with a definite and firm conviction that the superior court has made a mistake." [14] We review "the interpretation of a statute de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy." [15] When construing statutes, we consider three factors: "the language of the statute, the legislative history, and the legislative purpose behind the statute." [16] We have held that "the plainer the language of the statute, the more convincing any contrary legislative history must be . . . to overcome the statute's plain meaning." [17]

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion In Appointing The Office Of Public Advocacy As M.K.'s Guardian.

M.K. asks us to reverse the superior court, arguing that it erred in appointing OPA as guardian instead of M.K.'s mother, that it failed to properly apply AS 13.26.370(b), and that it erred in appointing a full as opposed to a partial guardian.

### 1. AS 13.26 does not require that the public guardian be appointed only when no other person is willing and qualified.

M.K. first argues that Alaska Statute 13.26.370(b), which states "[a] court may order the public guardian to act as [guardian] . . . if no person or private guardianship association is willing and qualified to perform the function"—when read in conjunction with AS 13.26.145, which lists priority of appointment—requires that M.K.'s mother be appointed as M.K.'s guardian.

### a. Applicable AS 13.26 guardianship statutes

Alaska Statute 13.26.145 governs guardianship selection. This statute provides that "[t]he court may appoint a competent person, including a private professional guardian, or the public guardian, as the guardian of an incapacitated person," [18] but may not appoint someone who has, or is likely to have, "interests that may conflict with those of the incapacitated person." [19] Notwithstanding this limitation, however, the court may appoint "the spouse, adult child, parent, or sibling of the incapacitated person [if] the court determines that the potential conflict of interest is insubstantial and that the appointment would clearly be in the best interests of the incapacitated person." [20]

Section .145(d) sets forth the order in which qualified persons have priority for appointment as guardian:

(1) an individual or organization nominated by the incapacitated person if, at the time of the nomination, the incapacitated person had, in the opinion of

---

11. See id.; see also Nichols v. Mandelin, 790 P.2d 1367, 1373 (Alaska 1990).

12. Farmer v. Farmer, 230 P.3d 689, 693 (Alaska 2010) (citing H.C.S., 42 P.3d at 1096).

13. Gunter v. Kathy-O–Estates, 87 P.3d 65, 68 (Alaska 2004) (citing In re S.H., 987 P.2d 735, 738–41 (Alaska 1999)).

14. Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs., 77 P.3d 715, 717 (Alaska 2003) (internal quotation marks omitted).

15. H.C.S., 42 P.3d at 1096 (citing Sosa v. State, 4 P.3d 951, 953 (Alaska 2000)).

16. Shehata v. Salvation Army, 225 P.3d 1106, 1114 (Alaska 2010).

17. Peninsula Mktg. Ass'n v. State, 817 P.2d 917, 922 (Alaska 1991).

18. AS 13.26.145(a).

19. AS 13.26.145(b)(3).

20. AS 13.26.145(c).

the court, sufficient mental capacity to make an informed choice;

(2) the spouse of the incapacitated person;

(3) an adult child or parent of the incapacitated person;

. . .

(7) the public guardian.[21]

This order of priority is subject to alteration by section .145(f), which provides:

> When in the best interest of the incapacitated person, a court may decline to appoint a person who has priority under (d) of this section as guardian of an incapacitated person and may appoint as guardian a person who has a lower priority than another person or who does not have a priority. If the court appoints a person with a lower priority under (d) of this section than another person, the court shall make appropriate written findings related to why the best interests of the respondent require appointment of the person with a lower priority.[22]

The second statute at issue, AS 13.26.370(b), states that the "court may order the public guardian to act as full guardian . . . if no person or private guardianship association is willing and qualified to perform the function."

**b. There is no conflict between AS 13.26.145 and AS 13.26.370.**

M.K. argues that the statutory language quoted above should be construed to mean that the public guardian may be appointed "*only if* no person is willing and qualified to be a guardian" (emphasis added), and that it was erroneous to appoint OPA when M.K.'s mother was willing to serve instead. M.K. argues that reading section .370(b) together with section .145 compels this conclusion.

The State responds that the best interest of the ward is paramount in guardianship decisions, that the plain meaning of these statutes does not suggest any conflict, and that if these sections are in conflict then section .145, being the more specific, should control.

■ When construing statutes, we consider three factors: "the language of the statute, the legislative history, and the legislative purpose behind the statute."[23] "[T]he plainer the language of the statute, the more convincing any contrary legislative history must be . . . . to overcome the statute's plain meaning."[24]

M.K. contends that the plain meaning of section .370(b) "states with unmistakable clarity that the public guardian may be appointed as guardian if no person is willing and qualified to serve the function." This is true. What it does not say, however, is that the public guardian may be appointed *only* in such cases.

M.K. offers an explanatory passage from AS 13.26.360, which states the purpose of the guardian statutes and observes that "[o]ften [incapacitated] persons cannot find a person able and willing to serve as guardian." Again, however, this merely reinforces OPA's chief mandate and does not imply that such cases are the only ones in which OPA may be appointed.

■ The State does not appear to contest—nor could it reasonably—that the public guardian exists as guardian of last resort. However, section .145(f) expressly permits the court to alter the default priority order set out in section .145(d). M.K. points to no statutory language that limits OPA's appointment only to cases in which no person is willing to serve, or indeed to any language that purports to override section .145(f). The plain meaning of these statutory provisions permits the superior court to appoint OPA as guardian instead of persons or agencies with higher priority, provided the court does so in conformity with the statutes.

---

21. AS 13.26.145(d).

22. AS 13.26.145(f) (emphasis added).

23. *Shehata v. Salvation Army,* 225 P.3d 1106, 1114 (Alaska 2010).

24. *Peninsula Mktg. Ass'n v. State,* 817 P.2d 917, 922 (Alaska 1991).

**c. The legislative history of the statutes does not support M.K.'s argument.**

M.K. offers excerpts from the legislative history of these statutes, arguing that "[t]he purpose and intent of the [l]egislature supports an interpretation that the public guardian is appointed *only if* no person is willing and qualified to be a guardian or conservator." (Emphasis added.) M.K. relies on legislative statements that explain, "The second thrust [of the bill] would establish a public guardian so that if no private guardian could be found, there would still be a public guardian available," [25] and the public guardian office "provides guardianship . . . services to incapacitated persons . . . when no one else is willing or qualified to perform in this capacity." [26] While the available legislative history reinforces the notion that the public guardian exists to provide services when no other person is qualified, it does not indicate legislative intent to limit the appointment of OPA only to such cases.

The State points to more recent legislative history pertaining to the legislature's later addition of a requirement that the court enter written findings in cases where it appoints OPA in place of family members.[27] The legislature explained that it did not want to see "the state guardian take[ ] the place of the spouse *unless there is some detrimental effect* or that the spouse is incapable of serving." [28]

The legislative history considered as a whole does not establish that the public guardian may be appointed only when no qualified and willing person exists. Rather, the history demonstrates that the legislature intended courts to do what the superior court did here: appoint OPA rather than someone with higher priority under section .145(d) pursuant to section .145(f)'s best interest mandate if the ward's best interest so requires.

**d. The superior court did not err in failing to apply AS 13.26.370(b).**

M.K. argues that the superior court erred by failing to apply section .370(b). She asserts that the superior court was required to find that her mother was not "qualified" before it appointed OPA under section .370(b). The State responds that the superior court was not required to specifically disqualify anyone under section .370(b) or to make any separate finding under that section.

We agree with the State. Section .370 is part of AS 13.26.360–.410, which establishes the office of the public guardian, and sets forth its powers and duties. Section .370(a) provides that "[t]he office of public advocacy . . . shall serve as the public guardian," and section .370(b) explains that "[a] court may order the public guardian to act as full guardian . . . if no person or private guardianship association is willing and qualified to perform the function." [29] This language is enabling authority, not a limitation of authority. Moreover, as explained above, even if section .370(b) did apply, it does not limit OPA's appointment to only those cases in which no other qualified person exists.

**e. Summary.**

■ Neither the plain meaning nor the legislative history of the applicable statutes supports M.K.'s contention that the public guardian may be appointed "only if no person is willing and qualified to be a guardian." Nothing in the language of the statutes or the legislative history indicates that the legislature intended that the public guardian act as guardian only when no other qualified person was available. Indeed, the public guardian is expressly included in AS 13.26.145(d)(7) on the priority list for appointment, and AS 13.26.145(f) expressly provides that the court "may appoint as guardian a person who has a lower priority than another person or who does not have a priority."

**25.** Minutes, Sen. Fin. Comm. Hearing on S.B. 3, 12th Leg., 1st Sess. (May 20, 1981) (statement of Senator Parr).

**26.** 1983 Senate Journal 1250.

**27.** Ch. 50, § 20, SLA 2008 (codified at AS 13.26.145(f)).

**28.** Minutes, H. Health, Educ., & Soc. Servs. Comm. Hearing on H.B. 427, 23rd Leg., 2nd Sess. (April 6, 2004) (statement of Paul Seaton, Representative, House) (emphasis added).

**29.** AS 13.26.370.

### 2. The superior court did not abuse its discretion in finding that it was not in M.K.'s best interest for her mother to serve as her guardian.

The superior court stated in its findings and order of guardianship that

> [t]he appointment of the Office of Public Advocacy is in the best interest of the ward and is in compliance with AS 13.26.145(f) because respondent's family members are not appropriate for this appointment at this time. The Office of Public Advocacy has the expertise and independence to act [on] respondent's behalf, and may delegate powers where that is in her best interest.

The superior court also specifically adopted by reference the reasons articulated in the visitor report, namely that "[n]o one in [M.K.]'s family, including [M.K.'s mother,] can objectively make decisions in [M.K.]'s best interest." The court also incorporated findings from 2005 and 2008 CINA cases involving M.K., including findings that M.K.'s mother "failed to protect [M.K.]" from abuse as a child, that M.K. had apparently been swayed by her mother's testimony into reversing her position during A.K.'s criminal trial, that M.K.'s mother had no plans to divorce A.K. despite his having been convicted of sexually assaulting M.K., that "[t]he family remained together for years after this disclosure [of sexual abuse] until [A.K.] was jailed, and [M.K.'s mother] doesn't believe that any crime was committed," and that M.K. is "mentally ill and easily influenced, especially by her mother."

Best interest findings are subject to review for abuse of discretion.[30]

### a. The superior court's best interest findings are adequate, are supported by the record, and are not conclusory.

█ M.K. argues that the superior court's best interest findings are conclusory,

and points to *H.C.S. v. Community Advocacy Project of Alaska*, a 2002 guardianship case in which we found the superior court's best interest finding to be conclusory.[31] In *H.C.S.*, we set forth certain factors relevant to determining the ward's best interest:

> This best interests determination will require the court to take into account the closeness of the ward's relationships to the existing and prospective guardians and conservators. This inquiry gives weight to the substantive values that apparently underlie the statutory priorities for appointing guardians and conservators.... [I]f a change would likely affect the ward's physical placement, the extent to which the ward has formed relationships with caregivers or others in the ward's present living arrangement may be relevant. Other circumstances may also be relevant in particular cases.[32]

M.K. argues that appointing her mother would be in her best interest. M.K. also argues that considerations of continuity favor keeping M.K. with her mother, that M.K.'s mother wishes to be M.K.'s guardian, and that M.K. wishes her mother to fill this role.

The State admits that the superior court's best interest findings "were not elaborate," but argues that "its shorthand reference to [M.K.'s mother]'s inability to 'objectively make decisions in [M.K.]'s best interest' speaks volumes, considering Judge Torrisi's familiarity with the . . . family." The State also argues that by specifically incorporating the findings from M.K.'s earlier CINA cases, the court adequately supported its decision.

Also, unlike in *H.C.S.* "where the hearing 'failed to address several unresolved factual disputes'[33] and the conclusory finding of best interest gave no indication whether the court considered relevant factors," in this case the superior court's findings offer a sufficient basis for us to determine the factu-

**30.** See *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc. ex rel. H.L.S.*, 42 P.3d 1093, 1096 (Alaska 2002); *see also Nichols v. Mandelin*, 790 P.2d 1367, 1373 (Alaska 1990).

**31.** *Id.* at 1100–01.

**32.** *Id.*

**33.** *Id.* at 1101.

al basis for the superior court's conclusion, as well as whether the court considered the appropriate factors. We agree.

We have held that the superior court's "findings need not be extensive, but must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved." [34] The superior court expressed its serious concerns regarding M.K.'s mother's ability and willingness to act in M.K.'s best interest. Judge Torrisi had extensive experience with M.K. and her family, and explicitly stated his intent to rely on his findings from these past experiences. Prior to entering its January 2010 guardianship order, the superior court issued thoughtful, six-page findings of fact and conclusions of law. The court also stated that it had considered M.K.'s preference in accordance with AS 13.26.113(g).

The court explained that "for the reasons articulated" in the visitor's report—which include that "[n]o one in [M.K.]'s family, including [M.K.'s mother,] can objectively make decisions in [M.K.]'s best interest"— M.K.'s mother was not the best choice for guardian. This reason alone is sufficient to support the best interest finding.

Moreover, the visitor's report and the prior CINA findings also highlight that M.K.'s mother has chosen to remain married to A.K., to allow him to remain in the home, and had no plans to divorce A.K., even in light of his conviction and incarceration for sexually assaulting their daughter M.K. M.K.'s mother testified that no decisions had been made yet regarding where A.K. would live after being released from parole. The court visitor reported that, "[a]ccording to [A.K.'s] probation officer, his plans are to return to [M.K.'s village], a fact that [M.K.'s mother] confirmed." The superior court's reservations that M.K.'s mother would not make decisions in M.K.'s best interest are amply supported by the record.

The superior court's findings also clearly indicate the factors that it considered important in exercising its discretion.[35] We conclude that these findings constitute appropriate written findings for the purposes of section .145(f),[36] and the court did not abuse its discretion in appointing OPA as guardian.

**b. The superior court did not err in failing to perform an AS 13.26.145(b) conflict of interest analysis.**

M.K. also complains that "[t]he trial court did not perform a conflict of interest analysis as provided in AS 13.26.145(b)." [37] M.K. calls her father's sexual abuse "the invisible elephant in the room" and concedes that "[i]t is certainly arguable that information was presented that might have been used by the trial court to reach its conclusion." Nonetheless, she argues that "one is left to speculate what information the trial court used."

M.K. is correct that the superior court did not conduct a separate conflict of interest

34. *Bird v. Starkey*, 914 P.2d 1246, 1249 n. 4 (Alaska 1996); *see also Julsen v. Julsen*, 741 P.2d 642, 649 n. 10 (Alaska 1987) (rejecting need for express tally of all statutory factors where record reflects careful scrutiny by superior court).

35. *See Bird*, 914 P.2d at 1249.

36. Alaska Statute 13.26.145(f) requires that "[i]f the court appoints a person with a lower priority under (d) of this section ... the court shall make *appropriate written findings* related to why the best interests of the respondent require appointment of the person with a lower priority." (Emphasis added.) In other cases we have remanded for "appropriate written findings" when we "cannot ascertain from the record the factual or legal basis for the trial court's order," and "the trial court failed to make any findings of fact and conclusions of law" in support of its order. *See, e.g., Krkovich v. Hodges*, Mem. Op. & J. No. S–2297, 1988 WL 1514918 at *3 (Alaska, June 8,

1988). Because the superior court elucidated reasons sufficient to support its best interest analysis, this standard has been met.

37. Alaska Statute 13.26.145(a) provides that "[t]he court may appoint a competent person, including a private professional guardian, or the public guardian, as the guardian of an incapacitated person," but section .145(b)(3) provides that the court may not appoint someone who has, or is likely to have, "interests that may conflict with those of the incapacitated person." Notwithstanding this limitation, under section .145(c) the court may appoint "the spouse, adult child, parent, or sibling of the incapacitated person [if] the court determines that the potential conflict of interest is insubstantial and that the appointment would clearly be in the best interests of the incapacitated person."

analysis under AS 13.26.145(b), and that it likely could have: M.K.'s mother's continuing marriage to M.K.'s sexual abuser is clear evidence of a conflict of interest. But although the court could have engaged in a conflict of interest analysis, it was not required to do so. There was a sufficient basis for the court to have proceeded as it did, identifying OPA as the guardian that would best serve M.K.'s best interest in accordance with section .145(f). The superior court did not abuse its discretion in declining to consider AS 13.26.145(b)'s conflict of interest analysis.[38]

### B. The Superior Court Did Not Abuse Its Discretion In Appointing A Full Guardian, As Opposed To A Partial Guardian.

■■■ M.K. finally argues that the superior court erred in appointing OPA as a full guardian rather than a partial guardian.

Alaska Statute 13.26.113 provides in relevant part:

(e) If it is found that the respondent is able to perform *some, but not all, of the functions necessary to care for the respondent,* and alternatives to guardianship are not feasible or adequate to provide for the needs of the respondent, the court may appoint a partial guardian, but *may not appoint a full guardian.*

(f) If it is found that the respondent is *totally without capacity to care for the respondent* and that a combination of alternatives to guardianship and the appointment of a partial guardian is not feasible or adequate to meet the needs of the respondent, *the court may appoint a full guardian.*

(Emphasis added.)

M.K. argues that the superior court should have appointed a partial guardian under section .113(e) based entirely on the fact that it authorized M.K. to determine where she would live. M.K. offers no citation of authority or persuasive argument in support of her contention that allowing her to decide where she lives somehow demonstrates that she is "able to perform some, but not all, of the functions necessary to care for" herself.[39] There is evidence in the record to support the superior court's appointment of a full guardian. In proper context, the court's grant of authority to permit M.K. to select where she wanted to live was a commendable effort by the court to respect her wishes in making this important choice.

## V. CONCLUSION

We AFFIRM the superior court's order appointing OPA as M.K.'s full guardian.

CHRISTEN, Justice, not participating.

---

38. It is also difficult to understand how the outcome would have changed had the superior court conducted a conflict of interest analysis. As even M.K. seems to recognize, it is very likely the court would have found a disqualifying conflict of interest precluding the appointment of M.K.'s mother as guardian because of her continuing marriage to M.K.'s father and the possibility of him returning to live with M.K.'s mother.

39. The superior court mistakenly cited AS 13.26.113(e) in its findings of fact and conclusions of law when reserving to M.K. the power to determine the community in which she would live. The State offers a plausible explanation: "Under AS 13.26.150(c), the court can modify the powers and duties assigned to a full guardian. By reserving to [M.K.] the power to choose her community of residence, the court did just that, despite its admittedly confusing reference to AS 13.26.113(e)." The superior court's errant reference to AS 13.26.113(e) was harmless.