226 P.3d 1030 (2010)
Robert L. FARMER, Appellant,
v.
Barbara FARMER, Appellee.
No. S-13330.
Supreme Court of Alaska.
March 19, 2010.
*1032 Martin A. Engel, Office of Public Advocacy, Anchorage, for Appellant.
Barbara Farmer, pro se, Anchorage.
Before: CARPENETI, Chief Justice, FABE, WINFREE, and CHRISTEN, Justices.

OPINION
WINFREE, Justice.

I. INTRODUCTION
A probate master appointed a temporary limited conservator for Robert Farmer. The conservatorship was reviewed the following year; the probate master held a hearing, found that Robert was incapacitated, and recommended that his daughter be appointed partial limited conservator. The superior court considered the matter de novo and ultimately adopted the probate master's findings and recommendations. Robert appeals, arguing: (1) the evidence does not support the need for appointment of a conservator; (2) the court failed to make a necessary finding for the appointment of a conservator; and (3) the conservatorship order is not the least restrictive alternative. Because its findings are sufficiently complete and not clearly erroneous and because it did not abuse its discretion in fashioning the conservatorship order, we affirm the superior court's decision.

II. FACTS AND PROCEEDINGS
Robert Farmer resides in Anchorage. He has four children, including daughters Barbara and Anita. Robert worked for the State of Alaska but his employment was terminated in January 2005. He filed suit against the State for wrongful termination, and also filed suit against other government entities. Approximately one year later Robert fell behind on his mortgage payments. To avoid foreclosure Barbara and Jennifer Farmer  Barbara's mother and Robert's wife  borrowed money from Jennifer's sister to make the mortgage payments, and Barbara also began to pay for Robert and Jennifer's utilities.
During the summer of 2006 Robert worked temporarily as a surveyor. In December 2006 Jennifer died and the home was again in danger of foreclosure. Barbara made additional mortgage payments to avoid foreclosure.
In January 2007 Barbara filed a petition for appointment of a guardian and conservator for Robert to protect Robert's home from foreclosure. Barbara continued to pay Robert's utilities during the spring and summer, even though foreclosure proceedings began in March and the foreclosure auction was scheduled for August.
The probate master held a hearing in August 2007 and found that Robert was "unable to manage his property and affairs effectively" and his home would be wasted or dissipated absent management by a conservator. The probate master appointed Anita temporary limited conservator for six months. As temporary limited conservator Anita was allowed only to sell Robert's home to Barbara and to manage the sale proceeds. Robert was allowed to reside in the home for at least one year after Barbara purchased it, with the mortgage payments for that year to be paid from the sale proceeds.
As it turned out, Anita conveyed Robert's home to Barbara in December 2007 with Barbara assuming the existing mortgage; the plan was to repair and market the home for sale, with the proceeds providing for Robert's future housing needs. Barbara began making improvements to market the home, but Robert, who continued to live in the home, often interfered with her efforts.
In March 2008 Barbara petitioned the superior court to review the conservatorship. The probate master held a hearing in August 2008. Barbara testified that she paid for Robert's utilities for almost two years, acquired food stamps and heating assistance *1033 for Robert and two younger siblings living in the home, and made mortgage payments to avoid foreclosure. She testified that she and her siblings had rented an apartment for Robert but he was unwilling to move into it. She stated that Robert "has an inability to prioritize" his financial obligations and spends money in an "irrational way"; for example, although he did not pay his phone bill, Robert bought electronics, engaged in unnecessary home-improvement projects, and spent money on alcohol, tobacco, and his lawsuits. According to Barbara, Robert refused to apply for disability benefits for fear that doing so would harm his lawsuits. In her closing comments to the probate master Barbara stated "[w]e are 100% unable to market the home while [Robert is] in it."
Robert then testified, claiming he used his retirement benefits to pay for utilities, his mortgage, and his wife's medical expenses. Robert stated he had applied for multiple state and federal assistance programs. He also testified he has a claim pending from the Exxon Valdez oil spill.
The court-appointed visitor[1] filed a report, noting that Robert displayed "poor judgment" regarding his funds and concluding that he was in need of a conservator. The court visitor emphasized that Robert's employment as a surveyor was seasonal. She also noted that a 2005 Veterans Administration evaluation was the only medical information available because Robert refused further evaluation.
The probate master found Robert was incapacitated "to the extent that he cannot effectively manage important financial matters and related decision making." The probate master noted Robert's refusal to consent to psychological or neurological testing, obsession with the "notion that the State of Alaska is persecuting him," abuse of alcohol, engagement in a series of expensive and time-consuming lawsuits against the State, and unwillingness to attend to important financial matters. The probate master also found Robert "exhausted his retirement accounts after a short time" and failed to pay utilities and other expenses. The probate master determined "[i]t is clear that Mr. Farmer's ability to make decisions and manage important financial matter[s] is significantly impaired by his apparent cognitive limitations and long time pattern of conduct."
The probate master recommended that Barbara be appointed partial limited conservator, with the authority to repair and market the home, locate and arrange substitute housing for Robert, and manage the net proceeds of the home's sale for Robert's future housing needs. The probate master also recommended that the appointment terminate in one year unless extended by the court, and that Robert vacate the property by October 1, 2008.
The superior court exercised its discretion to conduct a hearing de novo.[2] The court visitor testified at the hearing and agreed with the probate master's findings, emphasizing Robert's lack of steady income. Barbara testified about the events leading to the foreclosure and her purchase of the home. She described the repairs she made to the home and Robert's resistant behavior. She expressed concern that Robert was then unemployed and attributed Robert's monetary problems to his spending on the lawsuits, alcohol, electronics, and unnecessary home-improvement projects.
Robert also testified at the hearing. He described his employment history and the lawsuits he had filed against the State and other government entities. He denied mismanaging his funds. Robert admitted drinking beer and wine daily but denied abusing alcohol.
The superior court ultimately approved the probate master's findings[3] and adopted the *1034 probate master's recommendations, except that the date Robert was to vacate the home was changed to November 1, 2008.
Robert appeals.

III. STANDARD OF REVIEW
"We review the appointment of a limited guardian or conservator for abuse of discretion."[4] A court "abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[5] In reviewing factual findings used to determine whether to appoint a conservator, we apply a clearly erroneous standard.[6] Clear error "is found when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[7] We review a finding of incapacity for clear error.[8]

IV. DISCUSSION
Robert raises three issues on appeal. First, he argues the evidence does not support the need for a protective appointment under AS 13.26.165(2)(A). Second, he argues the court did not make a necessary finding under AS 13.26.165(2)(B), which mandates that for a conservatorship order a court must find "the person has property which will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care and welfare of the person. . . ." Third, he argues the court did not fashion the least restrictive protective order as required by AS 13.26.195(d).

A. The Evidence Supports a Protective Appointment Under AS 13.26.165(2)(A) and (B).
Alaska Statute 13.26.165(2) permits a court to appoint a conservator if the court determines:
(A) the person is unable to manage the person's property and affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance; and
(B) the person has property which will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care and welfare of the person or those entitled to be supported by the person and that protection is necessary or desirable to obtain or provide funds.[[9]]

1. Incapacity under AS 13.26.165(2)(A)
Robert argues the evidence presented does not support the superior court's finding of incapacity under AS 13.26.165(2)(A). We disagree.
Barbara introduced ample evidence of Robert's "inability to prioritize" his finances, even when he fell behind in paying his bills and his home was on the verge of foreclosure. She established that Robert misallocated his funds by purchasing ink for his printer, painting the exterior of his house, spending "a significant amount" on alcohol and tobacco, and dwelling obsessively on his lawsuits. She also demonstrated that, in refusing to apply for disability benefits for fear that doing so would harm his lawsuits, and in focusing on his lawsuits instead of finding steady work, Robert did not take steps to remedy his financial problems. And substantial evidence supports the court's finding that Barbara "has reliably and selflessly labored to keep the Farmer family financially afloat through a very difficult time."
*1035 Other evidence and considerations also support the superior court's decision. First, the court did not simply affirm the probate master's recommendations in summary fashion; rather, it conducted a hearing de novo and heard testimony from both parties. Second, Robert's own testimony provided the court an opportunity to gauge Robert's reasoning abilities relating to his financial situation and supported the court's finding of incapacity.[10] Robert not only testified with frequency and at length about his lawsuits, but also claimed that the government had tried to poison him. Third, the court visitor's testimony, as well as the report she submitted, reinforced Barbara's evidence that Robert was in need of a conservator.
Robert argues it was clear error for the court to find incapacity based on his "pursuit of lawsuits . . . because there was no evidence that his pursuit of these suits was an inappropriate dissipation or waste of his financial resources and there was no evidence that he chose to finance lawsuit expenses instead of paying his mortgage." But the court relied on Robert's fixation with the lawsuits and neglect of his financial situation  not the mere fact of the lawsuits themselves  as part of its basis for finding Robert to be incapacitated. The court properly relied on this factor even if, as Robert argues, the suits have some merit, the suits might be handled on a contingency basis, and the exact amount that Robert spent on the lawsuits was unknown.
Robert challenges evidentiary inferences that he abuses alcohol "to the point of incapacity or cognitive impairment," arguing that "[t]here was certainly no evidence of chronic intoxication as required for a protective appointment under AS 13.26.165(2)(A)." But the statute does not require a finding that alcohol abuse amount to chronic intoxication or alone is sufficient to establish incapacity.[11] The court may find alcohol abuse  even if that abuse falls short of chronic intoxication  to be one factor among many others leading to its conclusion that an individual is incapacitated and in need of a conservator. The evidence presented supports the court's finding that Robert abuses alcohol: Robert drinks every day, sometimes falls asleep with a drink in his hand, and spends "a significant amount" on alcohol.
Robert argues that it was clear error for the court to find he refused to attend to important financial matters because "[h]is testimony . . . shows that he tended to his financial matters with every resource he could." But Barbara and Anita both disputed much of Robert's testimony that he had sufficiently attended to his financial obligations after he stopped working for the State. Although Robert may have made some effort in the past to attend to his financial obligations  including providing for his ill wife  given the conflicting evidence we cannot conclude the court erred in making its finding.[12]
Robert argues it was clear error for the court to find that "[h]e exhausted his retirement accounts after a short time." He acknowledges that some evidence exists for this finding but contends Barbara "could not provide any specific details, or even rough approximations" about how he spent his retirement funds. Although she did not know how much money was in Robert's accounts, Barbara testified that Robert withdrew all his retirement funds at once and made poor spending decisions, including painting the *1036 outside of his house, obsessively pursuing his lawsuits, pouring concrete in the garage, and purchasing printers and ink. She further testified that the funds were depleted in approximately one year. This testimony is sufficient to support the court's finding.
Robert also contends the "finding that utilities and similar expenses went unpaid. . . is not a proper basis for a conclusion that [he] suffers from an incapacity and cognitive limitation." Here Robert does not seem to be challenging the basis of the court's factual finding, but rather the inference that such a finding evidences incapacity. But capacity to perform routine activities may be relevant in evaluating whether appointment of a conservator is appropriate,[13] and because the payment of utilities and similar expenses is a routine household activity, the court did not err in considering this factor.
Relying on AS 13.26.109(a),[14] Robert also challenges the court's finding that he refused to be medically evaluated and that this refusal could lead to an inference of incapacity. Although the court mentioned Robert's refusal to be evaluated, it does not appear the court relied on this fact in determining whether Robert was unable to manage his finances. Because the evidence is otherwise sufficient to support the court's ultimate finding of incapacity, we do not need to consider application of the statute in this case.
Substantial evidence supports the superior court's finding of incapacity under AS 13.26.165(2)(A), and therefore it is not clearly erroneous.

2. Property under AS 13.26.165(2)(B)
Robert argues the superior court erred by not expressly finding under AS 13.26.165(2)(B) that a conservator was necessary to prevent dissipation of his assets.[15] He goes on to argue that, even if the court did make the necessary finding, it is not supported by the evidence.
As noted above, the superior court adopted the findings of the probate master. The probate master, in recommending that Barbara be appointed partial limited conservator, did not expressly find that the residence or the proceeds from its sale would be wasted or dissipated unless a conservator was appointed. But the finding is implicit in the probate master's determination that Robert's "ability to make decisions and manage important financial matter is significantly impaired" and that "[t]he most important and pressing financial issue is [the] sale of the family residence."
Robert also argues the court erred in failing to find that "assets would be wasted or dissipated if [he] was not ordered to vacate his home while it is marketed for sale" and that "he must be removed from his home in order to sell the home and obtain funds for his care." This argument confuses the decision to initially appoint a conservator with the scope of the conservatorship. Alaska Statute 13.26.165(2)(B) does not require the court to find that Robert's assets would be wasted unless he was ordered to vacate his home or that obtaining funds for his care mandated his removal.
Additionally, Robert contends the evidence does not support a finding that he resisted *1037 efforts to sell the home. But Barbara's testimony supports the court's finding  she testified that Robert refused to move into the apartment that she and her siblings rented for him and that he impeded the home inspection process. She also described how Robert locked several doors within the home when a realtor arrived, followed the realtor throughout the home, and stated repeatedly that the home was not for sale. The court was not obliged to accept Robert's testimony that he would begin to cooperate with a plan to sell the home.[16]
We therefore reject Robert's argument that the court failed to make the finding required by AS 13.26.165(2)(B).

B. The Court Did Not Abuse Its Discretion in Entering the Limited Protective Order.
Robert argues the court's decision did not comply with AS 13.26.195(d), which provides in part that "[a] conservator may be appointed only if a less restrictive protective order or the services of a special conservator are not adequate to protect the estate of the protected person."[17] It appears Robert does not contest the sale of the home, only his removal from the home and the subsequent management of the sale proceeds. He claims the court should have allowed Barbara "to market the home for sale while he remains in the home with the right of first refusal to purchase the home." Robert also argues "[t]here is not a proper basis for issuing an order granting Barbara Farmer the authority to make decisions regarding Robert Farmer's housing prior to, or subsequent to the sale of his home." He reiterates that the evidence does not support a finding that he cannot manage his financial affairs.
The probate master expressly considered the intrusiveness of his decision and for that reason limited Barbara's power. We cannot conclude it was an abuse of discretion to mandate that Robert vacate the home in light of the evidence that Robert interfered with Barbara's efforts to sell the home. And evidence of Robert's inability to attend to his financial obligations supports both the grant of authority to assist Robert with his housing and the post-sale management of Robert's money.

V. CONCLUSION
We AFFIRM the superior court's decision in its entirety.
EASTAUGH, Justice, not participating.
NOTES
[1] AS 13.26.106(c) requires court appointment of a visitor in conservatorship proceedings and that "[t]he visitor shall arrange for evaluations to be performed and prepare a written report to be filed with the court. . . . The visitor shall interview the respondent. . . . The visitor shall conduct the interviews and investigations necessary to prepare the report. . . ."
[2] See Alaska R. Probate 2(f) (stating that superior court may conduct hearing de novo after probate master makes report and recommendations).
[3] See Alaska R. Civ. P. 52(a) ("The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court."); Alaska R. Probate 2(e).
[4] Gunter v. Kathy-O-Estates, 87 P.3d 65, 68 (Alaska 2004) (citing H.C.S. v. Cmty. Advocacy Project of Alaska, Inc., 42 P.3d 1093, 1096 (Alaska 2002)). But see In re S.H., 987 P.2d 735, 738-41 (Alaska 1999) (applying clearly erroneous standard to determine whether it was appropriate to appoint conservator).
[5] H.C.S., 42 P.3d at 1096 (citing S.N.E. v. R.L.B., 699 P.2d 875, 878 (Alaska 1985)).
[6] Gunter, 87 P.3d at 68 (citing In re S.H., 987 P.2d at 738-41); see also Alaska R. Civ. P. 53(d)(2).
[7] Casey v. Semco Energy, Inc., 92 P.3d 379, 382 (Alaska 2004) (citing Vezey v. Green, 35 P.3d 14, 20 (Alaska 2001)).
[8] In re W.A., 193 P.3d 743, 748 (Alaska 2008) (citing Casey, 92 P.3d at 382).
[9] AS 13.26.165(2).
[10] See Dodson v. Dodson, 955 P.2d 902, 907 (Alaska 1998) (quoting Demoski v. New, 737 P.2d 780, 784 (Alaska 1987)) ("We `will generally accept the determination of witnesses' credibility that are made by the court as a trier of fact, since the court heard and observed the witnesses first hand.'").
[11] See AS 13.26.165(2)(A) (providing that a court may appoint a conservator if it finds that "the person is unable to manage the person's property and affairs effectively for reasons such as . . . chronic intoxication.") (emphasis added). In a previous decision regarding AS 13.26.165 we declined to read additional requirements into the statute: "We must look to the statute to determine its requirements. It does not express or imply a requirement of long term inability; it only specifies that property be in danger of waste or dissipation." In re S.H., 987 P.2d at 740 (footnote omitted).
[12] See Estate of Smith v. Spinelli, 216 P.3d 524, 528 (Alaska 2009) (quoting Peterson v. Ek, 93 P.3d 458, 463 (Alaska 2004)) (noting that "`it is the province of the trial court to . . . weigh conflicting evidence'").
[13] Cf. In re S.H., 987 P.2d at 740 (observing that "an ability to function at some level, perhaps around the house" bears on need for conservator).
[14] AS 13.26.109(a) ("A ward or respondent has the right to refuse to respond to questions in the course of examinations and evaluations. However, the ward or respondent may be required to submit to interviews for the purpose of ascertaining whether the ward or respondent lacks the capacity to make informed decisions about care and treatment services.").
[15] Under AS 13.26.165(2)(B) a court may appoint a conservator only if it finds "the person has property which will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care and welfare of the person or those entitled to be supported by the person and that protection is necessary or desirable to obtain or provide funds." Failure to make an express finding satisfying subsection (2)(B) does not require automatic reversal. We review such errors for harmlessness. See In re S.H., 987 P.2d at 739 (noting that the superior court did not make a finding required by subsection (2)(B) but concluding that any error was harmless in light of the evidence presented).
[16] See In re Estate of Smith, 216 P.3d at 528 (quoting Ek, 93 P.3d at 463) (explaining that the trial court determines witness credibility).
[17] AS 13.26.195(d).