*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

|  |  |  |
|---|---|---|
| HELEN WILSON, | ) | Supreme Court No. S-15496 |
|  | ) |  |
| Appellant, | ) | Superior Court No. 3PA-13-00109 PR |
|  | ) |  |
| v. | ) | O P I N I O N |
|  | ) |  |
| STATE OF ALASKA, DEPARTMENT | ) | No. 7046 – September 4, 2015 |
| OF LAW, and STATE OF ALASKA, | ) |  |
| OFFICE OF PUBLIC ADVOCACY, | ) |  |
|  | ) |  |
| Appellees. | ) |  |
|  | ) |  |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Eric Smith, Judge.

Appearances: Shelley K. Chaffin, Law Office of Shelley K. Chaffin, Anchorage, for Appellant. Laura Fox, Assistant Attorney General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellee State of Alaska, Department of Law. Elizabeth Russo, Assistant Public Advocate, and Richard K. Allen, Public Advocate, Anchorage, for Appellee State of Alaska, Office of Public Advocacy.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

BOLGER, Justice.

## I.    INTRODUCTION

Helen Wilson is an elderly woman residing at the Palmer Pioneer home. Helen previously lived in her own house but was unable to manage her medications and nutrition independently. Her son and grandson lived with her but were unable or unwilling to help. After Adult Protective Services received several reports of harm, a temporary emergency guardian was appointed for Helen; the guardian placed her in an assisted living facility and then in the Pioneer Home. Despite her limited financial means, Helen continues to support her son and grandson, who remain in her house. Helen appeals the appointment of a partial public guardian and full conservator. We affirm.

## II.    FACTS AND PROCEEDINGS

### A.    Helen's Living Situation

Helen Wilson[1] is an elderly woman who lives at the Palmer Pioneer Home with her husband, who is in very poor health and has an appointed public guardian. Helen and her husband own a house in Wasilla, to which Helen wants to return after her husband's death. Helen's son and grandson reside in Helen's house. Helen's son's fiancée also stays at the house periodically but does not live there.

Deborah Rumbo from Adult Protective Services (APS) became involved with the Wilsons when Helen, her husband, and her grandson were all living in the Wasilla house. Helen's husband called APS reporting that he had been left home alone and needed help, and he was subsequently placed in assisted living. Helen's husband had been receiving in-home personal care assistant services, which incidentally benefitted Helen. These services ceased when Helen's husband moved out of their

---

[1]    We use a pseudonym to protect the appellant's privacy.

house, but out of concern for Helen, Rumbo arranged for approximately six hours a week of personal care assistant services through the Alzheimer's Resource Agency.

## B.    The Guardianship And Conservatorship Proceedings

In early 2013 APS received at least seven reports of harm regarding Helen. On April 1 Rumbo met with Helen, who was in the hospital at the time, to "follow up" on these reports. Later that month Rumbo filed a petition seeking the appointment of a public guardian. In the petition Rumbo stated that Helen was in the hospital "with complaints of pain" and that "her grandson who lives in the home with her reportedly refused to assist her." As Rumbo further alleged, Helen "was worried [that] her grandson or her son would take her and her husband's money and property while she was hospitalized" and no longer wanted her family living in the house, given that they did not contribute or assist her.

According to Rumbo, Helen's grandson had prevented her from calling 911 "in times when she needed treatment" because Helen had "agreed to be a third party custodian for him in a criminal matter." Rumbo also alleged that the grandson "attempted to get [Helen] to take Benadryl to aid her in sleeping[,] against medical advice" and despite "[contraindications] with her other pain medications." The petition further stated that Helen "indicated that [the] recent decline of her health resulted in multiple transports and admits to the hospital." Rumbo reported that Helen agreed with the guardian request and wanted help getting placed in the Pioneer Home. Rumbo requested a full guardian because Helen was unable to manage the application process for the Pioneer Home, and she requested a public guardian since she believed that no other appropriate individuals were available.[2]

_____

[2]    *See* AS 13.26.113(e)-(f). If a person "is able to perform some, but not all, of the functions necessary to care for" herself, "the court may appoint a partial guardian,
(continued...)

Just over a week after filing its original petition, APS filed a motion for an expedited hearing and the appointment of a temporary guardian. According to the accompanying affidavit, Rumbo received a report on April 24 that Helen "was found lying in her bed with a black eye." Helen "indicated that she fell in the bathtub the prior evening," but her son "did not provide any information."[3] Helen "was reported to be moaning and feeling dizzy[,] so she was taken to [the hospital]." Two days later Rumbo received a report, presumably from the personal care assistant, that the "[personal care assistant] was unable to enter [Helen's] home as nobody answered the door," despite the presence of two vehicles on the property. When Rumbo attempted to visit Helen with a police officer, Helen's son and his fiancée "became verbally combative" and refused to let them in. According to Rumbo, Helen was hospitalized after a fall reportedly sustained on April 27 and was also admitted for dehydration and poor nutrition.

Serving as a standing master for the superior court, Magistrate Judge Craig S. Condie held an emergency hearing on May 2 and found that the appointment of a temporary guardian was warranted. At the master's recommendation the superior court appointed the Office of Public Advocacy (OPA) as Helen's temporary guardian and conservator.[4] In coordination with OPA, Helen was initially placed in an assisted

---

[2]     (...continued)
but may not appoint a full guardian." AS 13.26.113(e). If a person "is totally without capacity to care for" herself "and the appointment of a partial guardian is not feasible or adequate to meet the needs of the [person], the court may appoint a full guardian." AS 13.26.113(f).

[3]     It is unclear whether Rumbo or someone else questioned Helen and her son.

[4]     A conservator manages property on behalf of someone who is unable to manage their own property. *See* AS 13.26.165(2).

living facility. In July Helen underwent a neuropsychological examination[5] conducted by Dr. Russell Cherry, a neuropsychologist with substantial experience evaluating the capacity of elderly people.

The long-term guardianship and conservatorship hearing was held in September, by which time Helen was living in the Pioneer Home. The State presented expert testimony from Dr. Cherry as well as testimony from Rumbo and Debra Heiker, Helen's temporary public guardian. Helen also testified.

Dr. Cherry testified that Helen "presented as far more intact than [he] expected given the records." He believed Helen had experienced "a several-month . . . apparent delirium episode" that occurred "most likely due to pain medications." He explained that "[d]elirium is a state of temporary confusion brought on by a medical condition. . . . [T]here's very compelling evidence that [Helen] had prior issues with delirium that resulted in her being misdiagnosed with dementia. But she wasn't delirious during [the] evaluation." Dr. Cherry diagnosed Helen with "age-related cognitive decline," "anxiety disorder," and "depressive disorder." He testified that Helen "had reduced performances on some tests" but that her performance was inconsistent, indicating that "something interfered with test performance." He speculated this could have been due to Helen's hearing problems, vision problems, or fatigue. He opined without reservation that Helen had "third grade math abilities."

In Dr. Cherry's opinion, Helen needed help managing her finances and would need daily assistance from a personal care assistant or a "family member with no prior history of predation or neglect" in order to live safely at home. His review of Helen's medical records showed that "several medical providers indicated financial

---

[5]     AS 13.26.106(c) provides that upon the filing of a guardianship petition the court shall "appoint an expert . . . to investigate the issue of incapacity," examine the respondent, and prepare a written report.

predation" and that "[s]everal medical providers indicated that her grandson may have been stealing her pain medications." His opinion was that Helen could be successful living at home if she had assistance with obtaining food and preparing meals, taking her medications, managing her finances, and doing paperwork necessary to obtain services such as Medicaid and personal care assistants. He believed that without assistance "[Helen] would probably have the same outcome as she had before," that "medications would [likely] get out of whack," that "predation" or "neglect" could occur, and that she would not succeed in "living completely independently." He testified that a conservator and in-home services were the least restrictive options for Helen.

Rumbo testified that she received eight reports of harm between February and April 2013 alleging "exploitation, self-neglect[,] and abuse." One report involved bruising seen on Helen's face and another alleged that Helen's son had prevented her personal care assistant from entering the house. Rumbo testified that during one attempt to visit Helen, she was similarly prevented from entering the house, "verbally abused," and "told never to return." And she testified that when she spoke to Helen at the hospital, Helen expressed concern about paying her bills and her family taking advantage of her. Rumbo agreed with Dr. Cherry's assessment that Helen needed a conservator and was incapable of arranging medical and personal care assistant services independently.

Heiker testified that Helen's cognitive abilities appeared to have improved from "what Dr. Cherry described as a [period of] delirium," and that she was operating with "minimal assistance" at the Pioneer Home. Heiker thought Helen could live at the house with personal care assistant services but had concerns about Helen living with her son and grandson.

Heiker also offered extensive testimony regarding Helen's financial situation. Heiker explained that so long as Helen remained at the Pioneer Home, her

only income would be her monthly Social Security benefit of $497.[6] If Helen moved home she would receive an additional $1,427 per month from her husband's pension and veteran's benefits, though Heiker testified that $631 of that would come from the Veteran's Administration (VA) and could involve a "long process" to obtain. Assuming Helen could obtain the VA money, her total income would be approximately $1,924 per month.

According to Heiker, Helen's expenses, including a mortgage payment of $965, utilities, homeowner's association fees, and car insurance, were $1,619. But this excluded food, personal items, and personal care assistant services, and personal care assistant services were expected to cost $130 to $150 per week unless Helen could obtain a grant. Heiker's testimony made clear that there was no scenario under which Helen's income exceeded her expenses.[7]

Helen testified that she did not want to sell her house and that her son and his fiancée had "promised to pay the house payment and the utility bills." She said, "I didn't feel that it was right to charge my son to stay in the house. . . . But since [the State] . . . want[s] the house so bad and want[s] to sell it so bad, I gave in to [my son] and told him yes. . . ." Helen said she did not know why the State was telling her she "need[ed] to sell the house."

---

[6]  A portion of that was supposed to pay for the Pioneer Home, but the Pioneer Home was temporarily charging Helen a substantially reduced rate during the pendency of the court proceedings.

[7]  The court visitor cited slightly different figures for Helen's income and expenses but ultimately concluded that Helen would be unable to pay her mortgage and living expenses without her husband's income. A court visitor is appointed by the court under AS 13.26.106(c) and "arrange[s] for evaluations to be performed and prepare[s] a written report to be filed with the court." "The visitor shall conduct the interviews and investigations necessary to prepare the report . . . ." AS 13.26.106(c).

When questioned by her attorney she indicated that her grandson provided some assistance around the house. She testified that her grandson "still works in the house" by "pick[ing] up behind his daddy" and "keep[ing] the bathtubs clean." But she later testified that she scrubbed the bathtubs, "clean[ed] [her] house from top to bottom three days a week," and "[did] the washing." When asked if her grandson helps with errands and shopping, she said yes. Helen denied that her grandson "scare[d] [her] physically," "threatened" her, or "[took] money from [her] . . . without [her] permission," adding that he had never taken her medication either. She testified that she gave her grandson money to buy books for college and "would do it again if [she] had to get out and stand on the corner and beg for food." Helen initially testified that she did not know whether her son was living at her house, but later said that "he may come and spend the weekend or something like that" but never lived in the house.

The court visitor, Bonnie Burgan-Kelly, did not testify but submitted two written reports completed in June and September 2013. Burgan-Kelly reported that Helen "has a long history of undiagnosed emotional/mental health problems" and "a long history of paranoid ideation." She also reported that Helen "was not able to identify her current or past medications" and that "[t]here is concern by both family and hospital employees that she abuses her pain medication." The report indicated that between May 31, 2012, and April 27, 2013, Emergency Medical Services responded to Helen's house 26 times. Between February 26 and April 27 of 2013, Helen was admitted to the hospital six or seven times, most of which involved multiple overnights. During Burgan-Kelly's visit with Helen at her assisted living facility, the conversation turned to "Jeff and possible financial exploitation or abuse," and Helen "became very upset and began yelling" and "then stated she was going to kill herself and began to choke herself."

In her June report Burgan-Kelly recommended a full guardian and conservator. But Burgan-Kelly's September report added that Helen had resumed

driving and was going home to do chores and stated that Helen "d[id] not meet the criteria for incapacity and a guardian." However, the report concluded that Helen "clearly need[ed] a conservator" because she was "very vulnerable to financial exploitation" and "d[id] not have a clear picture of her financial needs and the results of the decisions she makes."

The master found there was clear and convincing evidence that Helen was incapacitated and required a conservator and "partial guardian because she is able to perform some, but not all, of the functions necessary to provide for her own care." The master found that "[t]he most compelling evidence of incapacity came from [Dr. Cherry]" and that Helen "continues to exhibit some signs of decline and mental distress." He found that "[w]hen [Helen] is not suffering from delirium, she keeps herself sufficiently fed and groomed, and keeps the house clean and cared for. As such, there is clear and convincing evidence only with regards to those parts of a guardianship essential to helping [Helen] maintain a degree of independence."

The master observed that Helen needed help managing personal care because she "was previously unable to maintain the level of necessary care prior to the petition being filed" and her family had previously "interfered with [personal care assistants]." And the master found that Helen needed assistance applying for benefits and managing her assets due to her "limited math abilities," "age-related cognitive decline," "tendency to give away more money than she can afford," and "extremely tight budget," which made "[h]er ability to receive benefits . . . a major factor in maintaining her current level of independence." Accordingly the master gave the guardian authority

to provide for Helen's personal care,[8] apply for insurance and government benefits,[9] and "control [Helen's] estate and income . . . to pay for the cost of services that the guardian is authorized to obtain on behalf of [Helen]."[10]  He recognized that Helen should be free to give away her discretionary income, but that she needed "a partial guardian [to] ensure that she only gives money away after her own necessities, including adequate nutrition, medication, and housing costs, have been met."

The master concluded a conservator was necessary because Helen was unable to manage her finances, because "her family members are willing to take her money without much regard as to whether her needs are being met," and because "she is in a situation with extremely high potential for fraud."  However the master determined there was "not clear and convincing evidence that [Helen] lacks capacity to decide on whether to sell her house."  He noted it was unclear how Helen could "afford to live in her house" and that there was "cause for concern [regarding] her ability to make this decision" but concluded "at this point it should remain her decision to make."

Helen filed objections to the report, arguing that there was insufficient evidence she required a conservator or partial guardian and objecting to the appointment of a public guardian.

C.      Rehearing Concerning The Sale Of Helen's House

In November, before the superior court ruled on the master's recommendations, the public guardian filed a motion for sale of Helen's residence.  The master "treat[ed] this . . . like a motion for reconsideration" on the real property issue and allowed the parties to present evidence regarding what had happened with the property

---

**8**      *See* AS 13.26.116(b)(4).

**9**      *See* AS 13.26.116(b)(5).

**10**     *See* AS 13.26.116(b)(7).

since the September 2013 hearing. Heiker testified that because Helen was still living at the Pioneer Home, her house needed to be sold to pay for the cost of her care.[11] Heiker's testimony indicated that Helen was in a very precarious financial situation: her bank account balance was only $2,276. Heiker had sent a lease for Helen's house to Helen's family, but they did not reply or pay any rent. And according to Heiker, Helen was continuing to make excessive, unnecessary expenditures on behalf of her family despite Heiker's efforts to reduce her expenses.

Helen's attorney called Helen's son and his fiancée to testify. Helen's son testified he had been living in Helen's house for approximately three years. He said he had paid the gas and electric bills sometime around the prior October and had attempted to pay them again in November or December but could not because of the pending action to evict him from the house.[12] Helen's son and his fiancée both testified that they refused to sign the State's proposed lease because they objected to a provision prohibiting "interfere[nce] in any way with the provision of care services to [Helen]" but that they

---

[11]     To qualify for payment assistance for the Pioneer Home, "[a] resident's or a recipient's income and resources, up to the full amount of the income and resources if necessary, must [first] be applied to the appropriate monthly or daily rate . . . and to ancillary charges." 7 Alaska Administrative Code (AAC) 74.045(c)(1)(D); AS 47.55.020(d) ("[A] resident of [the Pioneer Home] whose income, assets, and other resources are insufficient to pay the monthly rate . . . and who does not have private insurance to cover the cost of care, qualifies for payment assistance . . . ."). "[R]eal property being used as the primary residence of the resident's . . . dependent" is exempt from this requirement. AS 47.55.020(d)(8); 7 AAC 74.045(c)(1)(D). It is unclear whether Helen's adult son and grandson are her dependents for purposes of this requirement. See AS 47.55.900 (defining terms for purposes of Pioneer Home statute but not defining "dependent"). But because Helen did not raise this argument before the superior court or on appeal, we do not need to decide whether this exemption applies.

[12]     Heiker had filed a forcible entry and detainer action to evict Helen's family members from the house.

would be willing to negotiate a different lease agreement or consider purchasing the house. Helen did not testify, but her attorney reiterated Helen's desire to stay at the Pioneer Home until her husband's death and then return home.

The master submitted a supplemental report that recommended granting the petition to sell the house because Helen "[was] unable to evaluate information related to ownership and sale of her house sufficiently to prevent loss of the home due to her mental deficiency and advanced age. The value of the home will clearly be wasted or dissipated unless proper management is provided." The master explained that his previous decision not to recommend the sale was "based in large part on [Helen's] statements in court that she was going to work with her son . . . and grandson . . . on a plan for them to assist with her finances." But the master reported that they had not contributed and Helen had "made no progress on addressing the financial viability of the home." The master stated that Helen's family "cannot cooperate with any outside assistance for [Helen]"; thus, even if they started paying rent it would be unworkable for them to live with her. And if Helen stayed at the Pioneer Home she was required to sell her house. Accordingly the master concluded that it was impossible for Helen to keep her house and that Helen lacked the understanding necessary to resolve these issues.

Helen filed objections to the master's supplemental report, reiterating her living preferences. In February 2014 the superior court adopted the master's report in full and ordered the sale of the house.

Helen appeals the appointment of a partial guardian and full conservator and the order authorizing the sale of her house.

## III. STANDARD OF REVIEW

A finding of incapacity is reviewed for clear error.[13] "[F]actual findings used to determine whether to appoint a conservator" are also reviewed for clear error.[14] "Clear error is found when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[15] The appointment of a guardian or conservator is reviewed for abuse of discretion.[16] "A court abuses its discretion if it considers improper factors, fails to consider statutorily mandated factors, or assigns too much weight to some factors."[17]

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err By Finding That Helen Was Incapacitated And Did Not Abuse Its Discretion By Appointing A Partial Guardian.

The superior court may grant a petition for guardianship upon a finding of incapacity when the persons's "ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the

---

[13]     *Farmer v. Farmer*, 230 P.3d 689, 693 (Alaska 2010) (citing *In re W.A.*, 193 6P.3d 743, 748 (Alaska 2008)).

[14]     *Id.* (citing *Gunter v. Kathy-O-Estates*, 87 P.3d 65, 68 (Alaska 2004)).

[15]     *Id.* (quoting *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 382 (Alaska 2004)) (internal quotation marks omitted).

[16]     *Id.* (citing *Gunter*, 87 P.3d at 68).

[17]     *Id.* (quoting *H.C.S. v. Cmty. Advocacy Project of Alaska, Inc. ex rel. H.L.S.*, 42 P.3d 1093, 1096 (Alaska 2002)) (internal quotation marks omitted).

person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance."[18]  Under AS 13.26.090,

> [g]uardianship for an incapacitated person shall be used only as is necessary to promote and protect the well-being of the person, shall be designed to encourage the development of maximum self-reliance and independence of the person, and shall be ordered only to the extent necessitated by the person's actual mental and physical limitations. An incapacitated person for whom a guardian has been appointed is not presumed to be incompetent and retains all legal and civil rights except those that have been expressly limited by court order or have been specifically granted to the guardian by the court.

The petitioner must prove incapacity by clear and convincing evidence.[19]  The court may appoint a full or partial guardian depending on the person's needs.[20]

---

[18]      AS 13.26.005(5); AS 13.26.105(a).  "[E]ssential requirements for physical health or safety means the health care, food, shelter, clothing, personal hygiene, and protection without which serious physical injury or illness is more likely than not to occur."  AS 13.26.005(2) (internal quotation marks omitted).

[19]      AS 13.26.113(b); *see also In re O.S.D.*, 672 P.2d 1304, 1305 (Alaska 1983) ("[A] clear and convincing evidence standard of proof applies to the capacity determination." (internal quotation marks omitted)).  If the person is found to be incapacitated, the court must consider alternatives to guardianship, and if it determines that "alternatives to guardianship are feasible and adequate to meet the needs of the respondent, the court may dismiss the action and order an alternative form of protection." AS 13.26.113(c)-(d).  If alternatives to guardianship are not feasible, the court may appoint a partial or full guardian.  AS 13.26.113(e)-(f).  The court did not explicitly consider alternatives to guardianship, but Helen does not raise this issue on appeal, and the implicit conclusion that there were no feasible alternatives is not clearly erroneous.

[20]      AS 13.26.113(e)-(f).  "If it is necessary to appoint a guardian, the court shall consider the ward's preference."  AS 13.26.113(g).  Although Helen previously requested a different guardian, she does not appeal the superior court's choice of

(continued...)

Helen argues the superior court's determination that she was incapacitated was clearly erroneous.[21] As a preliminary matter, we address Helen's claim that Dr. Cherry's recommendation relied on unproven hearsay regarding Helen's grandson and her ability to manage her nutrition and medications. To the extent Helen raises an evidentiary argument, she failed to raise such an objection at trial, and "[a]bsent a proper objection, hearsay is normally admissible."[22] Even if Helen had objected, the rules of evidence permit an expert witness to consider inadmissible information when formulating an expert opinion.[23] Thus a physician may base opinions on "statements by patients and relatives,

---

[20]    (...continued)
guardian.

[21]    Helen cites *Farmer v. Farmer*, 230 P.3d 689, for the proposition that the superior court's "factual findings are not entitled to the deference usually enjoyed by the trial court because [the trial court judge] did not conduct any of the hearings in this case in order to assess the witnesses' credibility." However, *Farmer* merely noted that a superior court's decision was particularly persuasive because the court "conducted a hearing de novo and heard testimony from both parties"; it does not support the proposition that a master's findings, where adopted by a superior court, will be subject to less deferential appellate review. *Id.* at 694. As the State points out, "[t]he findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." Alaska R. Civ. P. 52(a); *see also* Alaska R. Prob. P. 2(b)(2)(B) (providing for the appointment of masters to conduct guardianship and conservatorship hearings); *In re O.S.D.*, 672 P.2d at 1306 & n.4 (rejecting "conten[tion] that incorporation of the Master's Report in the superior court's order is inadequate").

[22]    *Rusenstrom v. Rusenstrom*, 981 P.2d 558, 560 (Alaska 1999).

[23]    Alaska R. Evid. 703. Such information "must be of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Id.*

reports and opinions from nurses, technicians and other doctors, [and] hospital records" despite the fact that "[s]ome of these sources would be inadmissible in evidence."[24]

Helen next argues that "[t]here is no evidence that Helen required any special services." She claims that "[e]veryone, including many perfectly healthy young and middle-aged adults[,] could benefit from in-home services to aid them in the preparation of healthy meal[s] and with their finances." And she asserts that "Dr. Cherry's opinion that Helen could benefit from . . . some minor in-home [personal care assistant] services and some minor financial oversight 'like anybody who's eighty-seven years old' does not constitute clear and convincing evidence that Helen is an 'incapacitated person.' "[25]

We disagree. There was substantial evidence that Helen was incapacitated and required assistance. Dr. Cherry testified that Helen had "age-related cognitive decline," previously experienced a several-month delirium episode, and had "multiple issues that could result in [another] delirium episode." He did recognize that most people Helen's age could benefit from "at least [a] minimal level of assistance." But contrary to Helen's characterization, Dr. Cherry unambiguously stated that she needed such assistance. Specifically he testified that Helen should have personal care assistance

---

[24] Alaska R. Evid. 703, cmt. The Commentary to Alaska Evidence Rule 703 specifically acknowledges that "[t]he rule may be most beneficial in the examination of psychiatrists, who may often rely on data that is technically hearsay." *Id*.

[25] In this same vein, Helen denies that her husband's personal care assistant "performed any function on behalf of Helen other than those functions performed for [her husband] which equally benefitted Helen." But any past reliance on personal care assistance did not appear to significantly inform the master's findings; rather, the master looked to Dr. Cherry's expert testimony, the necessity of personal care assistance, and the possibility that Helen's family might interfere with the provision of this care.

services on a daily basis and that he could not envision Helen living independently absent assistance with meals, medication, and financial management.

Finally Helen contends she is capable of managing her medications, attributing her medication problems to her doctors' errors. But this argument is unpersuasive. Helen contends that "her licensed medical providers prescribed dangerous medications based on their misdiagnosis of Helen's medical condition" but provides no evidentiary support for this claim. According to Dr. Cherry, Helen was incorrectly diagnosed with dementia when she was actually suffering from delirium. But Helen does not point to any evidence that she was prescribed dementia medication or that such medication was dangerous. And Dr. Cherry's testimony was that Helen's pain medications *caused* the delirium that was initially misdiagnosed, not that she was prescribed dangerous pain medications because of the misdiagnosis. It is possible Helen is referring to a different diagnosis prior to the delirium, as she references "unnecessary sedative medications," but there is not enough information in her brief to permit consideration of this argument.[26] Dr. Cherry testified that Helen's medication intake would likely "get out of whack" if she were left to manage her medications independently, and this opinion is supported by both his and Burgan-Kelly's observation that Helen could not name any of her medications.[27]

---

[26] *See, e.g.*, *Barnett v. Barnett*, 238 P.3d 594, 598 & n.11 (Alaska 2010) (deeming arguments inadequately briefed on appeal waived).

[27] Courts have considered an individual's awareness of his or her medications and ability to manage them when determining whether an individual is incapacitated. *See, e.g.*, *E.J.F. ex rel. J.V.*, No. 2081, 2013 WL 6122275, at *1-3 (N.Y. Sup. Nov. 18, 2013) (affirming guardianship for man with acute short term memory loss in part because man was "likely to suffer harm because he is unable to provide for his personal needs such as his medications . . . ."); *In re Guardianship of Robinson*, No. 40966-6-II, 2012 WL 830483, at *1 (Wash. App. Mar. 13, 2012) (affirming guardianship of man who (continued...)

Therefore there is substantial evidence that Helen was incapacitated and needed a partial guardian. The superior court conducted a careful analysis and reached a well-reasoned conclusion that Helen required only a partial guardian because she was able to manage some, but not all, of her essential needs.  Although the Pioneer Home may be able to manage some aspects of Helen's care, a guardian remains necessary because Helen is incapable of managing paperwork or her residency at the Pioneer Home,  as evidenced by her inability to appreciate the fact that she could not afford her care at the Pioneer Home without selling her house.[28]  We affirm the superior court's appointment of a partial public guardian.

**B.      The Superior Court Did Not Clearly Err By Finding That Helen Was Unable To Manage Her Property And Affairs, And The Court Did Not Abuse Its Discretion By Appointing A Public Conservator.**

Alaska Statute 13.26.165(2) permits a court to appoint a conservator if the court determines that

> (A)    the person is unable to manage the person's property and affairs effectively for reasons such as mental

---

[27]      (...continued) among other problems had frequent "hospitaliz[ations] because he [was] unable to handle his complex medication regimen and personal care, as well as his hydration needs" and "was aware of needing only one medication, although he had been prescribed seventeen"); *In re Guardianship of Healy*, No. 58316-6-I, 2007 WL 2411688, at *7 & n.12 (Wash. App. Aug. 27, 2007) (affirming guardianship for elderly woman despite objection that trial court failed to adequately consider that her medications may have impacted her ability to understand the guardianship proceedings).

[28]      *See* 7 AAC 74.045(c)(1)(D) ("A resident's or a recipient's income and resources, up to the full amount of the income and resources if necessary, must be applied to the appropriate monthly or daily rate . . . and to ancillary charges."); AS 47.55.020(d) ("[A] resident of [the Pioneer Home] whose income, assets, and other resources are insufficient to pay the monthly rate . . . and who does not have private insurance to cover the cost of care, qualifies for payment assistance . . . .").

illness, mental deficiency, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication, fraud, confinement, detention by a foreign power, or disappearance; and

(B) the person has property that will be wasted or dissipated unless proper management is provided, or that funds are needed for the support, care, and welfare of the person or those entitled to be supported by the person and protection is necessary or desirable to obtain or provide funds.

A conservatorship "does not require that a person be altogether incompetent in all aspects of life. . . . [T]he need for a conservator must be assessed in context of the person's incapacity and the specific matters for which management or protection may be required."[29]

Helen argues that the conservatorship and the order to sell her house should be reversed because the superior court's determination that she "is unable to effectively manage her property and affairs is clearly erroneous." She argues that she "pa[id] all of her bills prior to the temporary delirium ca[u]sed by her prescribed medication, . . . amassed $100,000 in equity in the home, owed nothing on her remote property or her vehicle, and had no unusual credit card debt." She asserts that the finding that she had not made progress on the financial situation with her house was erroneous because it was "based on the trial court's ridiculous finding that Helen knew that her family would not be allowed to live with her in her home." Helen claims that "[t]he sole

_____

[29]    *In re S.H.*, 987 P.2d 735, 740 (Alaska 1999). At first glance the master's initial determination that Helen was incapable of managing her finances but capable of deciding whether to sell the house may seem contradictory. But the master appropriately considered the specific matters Helen faced; he determined she may have been "able to understand big picture issues" even if she was unable to handle the minutia of public assistance programs or restrain herself from giving away more money than she could afford.

basis" for the master's revised findings regarding the house "appears to be that Helen did not force her family to sign the guardian's unilateral lease." She also argues that "there is no evidence Helen's family was aware of the requirement that the family home be sold while Helen remained at the Pioneer Home." Finally she contends that she could not "be expected to [make] financial arrangements" because Heiker refused to give her financial documents and did not "t[ell] Helen her home was on the brink of foreclosure."

The State counters that there was no choice but to sell the house because the "house constituted an asset that had to be used to pay for the cost of [her] care" at the Pioneer Home.[30] It argues that a conservatorship is " 'necessary or desirable to obtain or provide funds' for [Helen's] care."[31] Although Helen eventually wanted to return home, the superior court found that she could only afford to return home if her family was living with her and paying rent, but she could not live with her family because they would not cooperate with the personal care assistants.[32] And if Helen did not return home, she would "be required to sell the home as a condition of remaining [in] the Pioneer Home." The superior court concluded that Helen's "proposal on how to proceed from here does

---

[30]    *See* note 28, *supra.*

[31]    *See* AS 13.26.165(2)(B). *See also, e.g.*, *Farmer v. Farmer*, 230 P.3d 689, 691-92, 696 (Alaska 2010) (affirming partial limited conservator to manage sale of home facing foreclosure where person was unable to prioritize financial obligations, for example by making unnecessary expenditures instead of paying his utilities).

[32]    Helen argues the finding that her family would not cooperate with personal care assistants was erroneous because it was based on "unproven, speculative allegations" and "[t]here is no evidence anyone in the family ever interfered with the obligations of [Helen's husband's personal care assistants] to provide any service to the [Wilsons.]" This finding was not erroneous because Helen's family testified that they objected to allowing personal care assistants in the home.

not reflect any meaningful understanding of these issues" and that she was "not capable of making a decision regarding [the] sale of the home."

Helen's other arguments also fail to demonstrate that the superior court clearly erred in its findings. Her ability to pay her bills and amass equity in her house in the past is not relevant to her present financial situation. And Helen's assertion that Heiker would not provide her with financial information is contradicted by Heiker's testimony that she met with Helen "[a] couple" times and that Helen refused to meet with her on another occasion. Although it is true "[t]here is no evidence Heiker told Helen her home was on the brink of foreclosure," the "master informed her [at the September hearing] that she needed to develop a plan towards financial stability with regards to the house or she would not be able to afford it." Despite this warning, she was unable "to develop any workable ideas [in] four months." The superior court did not clearly err in finding clear and convincing evidence that Helen was unable to manage her financial affairs and did not abuse its discretion by appointing a public conservator.

## V. CONCLUSION

We AFFIRM the decision of the superior court.